KELLY, APPELLANT, *v.* GRAINEY ET AL., RESPONDENTS.

(No. 8,287.)

(Submitted June 26, 1942.   Decided October 2, 1942.)

[129 Pac. (2d) 619.]

522

Mr. R. F. *Gaines,* for Appellant, submitted an original and a reply brief, and argued the cause orally.

Mr. *William A. Brown,* for Respondents, submitted a brief and argued the cause orally.

MR. CHIEF JUSTICE JOHNSON delivered the opinion of the court.

The plaintiff, Peter J. Kelly, appeals from a judgment in favor of defendant, Rose Grainey, upon the latter's cross-complaint in a quiet title action. The pleadings are in the usual form, each party joining issue with the other's cause of action. It will not be necessary to refer to the other two defendants, whose rights are agreed to be dependent upon those of Rose Grainey.

Briefly stated, the controversy is whether, as asserted by defendant (plaintiff's sister) and found by the trial court, anoth-

er sister, Mae J. Kelly, while plaintiff's employee, informed of all the facts, and living on the premises in question with his consent, initiated against him a claim of adverse possession, perfected it while still living there with his consent, and thereafter conveyed it to defendant as a bona fide purchaser for valuable consideration. The controversy, which has disrupted a family and involved the title to property costing plaintiff $4,600, has arisen because he and his sister Mae, upon whom defendant bases her claim to title by adverse possession, dealt with the property for their parents' benefit, without legal advice.

The undisputed evidence shows that in 1917 the plaintiff was residing with his parents, his daughter and his sister, Mae J. Kelly, that he bought the Butte residence property in question here, known as 221 Jackson Street, for $4,600, paying for it with his own funds, and that all of them then moved into the house. Having taken them into his new home he paid the household expenses, although they were not dependent upon him. He had just taken office as county assessor and had appointed Mae as a deputy in his office at a monthly salary of $150, later raised to $162.50. The father was employed as a mine watchman at a wage of $4 per day. The defendant, Rose Grainey, another sister of the plaintiff, was married and living at Helena during all the times in question.

In December, 1918, being about to marry again, plaintiff deeded this property to his parents and on the same day and as part of the same transaction they deeded it back to him. The deed to them was recorded some two months later but the reconveyance to plaintiff was not recorded until 1939, after this controversy had arisen and his mother had informed him that she did not need the property any longer and that he should resume possession.

Plaintiff testified that the purpose of the two deeds was to transfer to his parents a life estate, retaining the reversion in him by means of the reconveyance under which he would reclaim the property only at their death in order to prevent claims to it by his brothers and sisters; that the matter had been

discussed by his parents, himself and his sister Mae, that he had told Mae and she knew the purpose of the deeds, and that Mae had prepared both deeds in plaintiff's office.

There was no change of occupancy or possession when the deeds were given, plaintiff continuing to live there with his relatives; but two months later, in February, 1919, plaintiff remarried and moved to another house, leaving his parents, his sister Mae and his daughter living in the house in question.

Although neither Mae nor the parents had become dependent upon him, plaintiff continued to contribute for the household expenses while his daughter was living with them; but when she moved elsewhere in 1921 he discontinued regular contributions.

While he continued to live in this house with his relatives plaintiff kept charge of the property and paid the taxes, but upon his marriage and removal Mae took charge of it and continued to manage it until shortly before her death, paying the taxes, making the repairs and collecting the rent. During the six years, 1917 to 1922, the plaintiff continued to be county assessor of Silver Bow county, and Mae was deputy in his office.

In 1922 Mae decided to buy the adjoining property, on which was a smaller house which she considered large enough for herself and her parents, plaintiff's daughter having gone elsewhere. She attempted to borrow the entire purchase price of $2,500 from a Butte bank but learned that the bank could not make a 100% loan on the property. She then inquired whether the property here in question would constitute sufficient additional security; finding that it would, she returned, first with a deed to her from her mother alone, and, when that was rejected, with a deed to her from both parents. The loan was then consummated, the bank taking as security in lieu of a mortgage a deed to John Burke, one of its officers, as trustee. Upon its merger with the Metals Bank & Trust Company, a deed was executed by Burke as trustee to the latter bank. In 1923, when the loan was reduced to $1,500, Mae obtained the release of her own property by means of a deed to her from the bank; this deed was not recorded until after her death. In 1925, when the loan

was paid in full, Mae obtained the release of the property at 221 Jackson Street, by a deed to her which she recorded about two weeks later, thus again placing the record title in her name.

Upon purchasing the adjoining property in 1922, Mae and the parents moved into the house thereon, and Mae rented the 221 Jackson Street premises to tenants. She never accounted to plaintiff for the rent, but continued to pay the taxes and upkeep, as she had done since plaintiff had turned over the management of the property to her upon his marriage and removal.

Mae never told plaintiff of the bank transaction or of the deed to her from the parents, and he never received actual notice thereof, or of the subsequent deed from her to plaintiff, until June, 1939, about four months before filing suit, although the various deeds were recorded and thus constituted constructive notice.

The parents did not become dependent upon their children until 1929, about a year before the father's death, when he became unable to continue work as a mine watchman. However, as noted above, plaintiff had paid the household expenses while living with them at 221 Jackson Street, and contributed regularly for two years longer, while his daughter continued living there.

It does not appear what use Mae J. Kelly made of the rent, but she is entitled to the presumption that she used it to continue paying upkeep and taxes (which she had begun to do after plaintiff's marriage in 1919) and used the remainder for the benefit of the parents, in accordance with plaintiff's intent, fully known to her, that they should have the benefit of the property during their lifetime.

After the disability of her father in 1929 she supported both parents until her father's death in 1930, and then her mother until her own death in 1937. The mother was then taken to live with defendant and her family at Helena, and continued there until her death sometime after the trial of this case in district court, which was held in September, 1940. The relations

of all the family continued friendly until this controversy arose in 1939.

In October, 1937, two weeks before her death, being conscious of her condition, Mae deeded to defendant both this property and the adjoining premises which she had bought. Defendant paid nothing for the deeds.

The defendant contends that by acquiring the deed from the parents on April 4, 1922, the sister, Mae J. Kelly, initiated a claim by way of adverse possession against the plaintiff which subsequently ripened into full title by Mae's exclusive possession of the property until her death fifteen years later, during which period she paid the taxes as required by section 9024, Revised Codes.

Defendant further contends that the deed to her from Mae in 1937, shortly before the latter's death, was given in consideration of her oral promise to support the mother for the remainder of her life; that defendant therefore, without knowledge of the parents' deed to plaintiff, acquired the property as a purchaser for valuable consideration and in good faith, and that as plaintiff's deed was not recorded until after hers, it is void as against her, sec. 6935, Rev. Codes, although unrecorded deeds are valid as between the parties and those who have notice thereof (sec. 6938, Id.)

On the other hand, plaintiff contends that the two deeds from him to his parents and from his parents to him were intended as, and in effect constituted, the giving of a life estate to his parents with reversionary interest in him, and therefore, that since he did not have the right of possession during their lifetime, Mae J. Kelly's acts could not constitute such adverse possession against him as to start running a claim for adverse possession.

The trial court decided for defendant, finding that by the first two deeds the title remained in plaintiff, that on April 4, 1922, the parents executed a deed "purporting to convey" the property to Mae, that she had adverse possession until October 26, 1937, when she "sold and transferred" the property to de-

fendant in consideration of the latter's promise to care for the mother during her lifetime; that the defendant had no knowledge of the reconveyance by the parents to plaintiff nor notice sufficient to put her on inquiry. The conclusion of law and decree were in accordance therewith.

It is apparent that the legal effect of the execution of the two simultaneous instruments upon the actual title was exactly nothing, since they constituted parts of a single transaction which left the title in plaintiff. It was the act of the parties in recording the conveyance to the parents, but not the reconveyance to plaintiff, which constituted the only substantial effect of the deeds themselves, and that was to place in the name of the parents the record title as distinguished from the actual title. Thus the sole legal effect of the transaction was to place the record title in the parents' name while retaining the actual title in plaintiff.

No concurrent understanding or condition can have altered the effect of the delivery of the parents' reconveyance to plaintiff. For while under section 6846, Revised Codes, a deed may be deposited in escrow with a third person, section 6845 provides: "A grant cannot be delivered to the grantee conditionally. Delivery to him, or to his agent as such, is necessarily absolute, and the instrument takes effect thereupon, discharged of any condition on which the delivery is made."

It is uncontradicted that the understanding of all the participants, including Mae, was that the parents were to have the use and occupancy of the property for their life. But since a life estate may be created only in writing or by operation of law (sec. 6859, Rev. Codes), it is apparent that no life estate was ever granted to the parents. Such oral understandings as the evidence indicates could not have entitled the parents to equitable enforcement, since it is apparent that there was no consideration furnished by them. However, the record shows clearly that the arrangement was understood by all the family, except perhaps defendant, who denies knowledge of it, and that the plaintiff during his parents' lifetime adhered to the arrange-

ment and left the property for their use, although the legal title was in him by virtue of the reconveyance.

Among the duties of life tenants is the payment of taxes (sec. 6776, Rev. Codes), and it is perhaps significant that plaintiff paid no taxes on the property after he exchanged the deeds with his parents in December, 1918, and remarried and went to live elsewhere two months later. From that time on, Mae J. Kelly, who continued to live on plaintiff's property with her parents, managed the property and paid the taxes. During the next two years, while plaintiff's daughter still resided there and plaintiff continued to contribute to their household expenses, it does not appear whether Mae paid the taxes from his contributions, from her own salary, or from her father's wages, nor does it appear whether during the third year she paid them from her own or her father's income, nor whether after buying and moving into the adjoining premises and renting 221 Jackson Street in 1922, she paid the taxes from the rent or from her own income or from her father's wages. It does appear, however, that in view of the circumstances the plaintiff was perhaps entitled to assume that his parents would carry out the slight obligations incident to the legal status intended. But in any event, not having received actual notice of the 1922 transactions concerning the record title, he had no reason to consider that there was any change in the nature or effect of the payment of taxes.

That Mae not only had knowledge of the state of the title, but that she actively participated in the deed transactions, clearly appears from the mother's deposition taken at defendant's home, in which she testified:

"Q. Well, do you remember that Peter gave you a deed to this property? A. Yes.

"Q. And do you remember how he happened to give it to you? A. I couldn't tell you. That was left to my daughter and my husband to manage it.

"Q. And you don't remember anything about how the deed

came to you and your husband? A. No, only that he paid for the house; that is all I know.

"Q. You mean Peter paid for it? A. Yes. * * *

"Q. Now, Mrs. Kelly, the records over in Butte in the courthouse show that in the year 1922 you and your husband gave a deed to this 221 North Jackson Street to your daughter Mae. Do you remember anything about that? A. I don't know anything about that.

"Q. You don't know anything about that deed? A. No; they done their own business, and I never bothered. My daughter had to take care of those things, and my husband too.

"Q. But as far as you can remember now you don't know how you and your husband happened to sign a deed to your daughter Mae? A. No, I couldn't tell you. * * *

"Q. In fact, all the transactions about the property and all of these deeds and things you don't remember very much about it? A. No, I left that all to her [Mae]; she was there to take care of it. * * *

"Q. And was your daughter [defendant] claiming it as her house?" [after Mae's death] A. Well, he paid for it, and should be his."

There is no question that both the parents and Mae J. Kelly ▮▮▮ were in possession of the property with plaintiff's permission; Mae's possession was under permission from him, either directly, or indirectly through the parents, and with knowledge of the title. It is impossible to base title by prescription or limitation upon such possession. (*Waddell* v. *School District*, 74 Mont. 91, 238 Pac. 884; *Ferguson* v. *Standley*, 89 Mont. 489, 300 Pac. 245; 2 C. J. S. 624, Adverse Possession, sec. 80.)

While a permissive possession may subsequently become hostile (2 C. J. S. 639, Adverse Possession, sec. 87), to make it so there must be a repudiation of the permissive possession and of the recognition of ownership implicit therein, and the repudiation must be brought home to the owner by actual notice, or at least by acts of hostility so manifest and notorious that the actual notice must be presumed. (*Coquille Mill & Mercantile*

Co. v. *Johnson,* 52 Or. 547, 98 Pac. 132, 132 Am. St. Rep. 716; *Zeller's Lessee* v. *Eckert,* 16 U. S. 289, 4 How. 289, 11 L. Ed. 979; 2 C. J. S. 642, Adverse Possession, sec. 87; 1 Am. Jur. 807-10, .secs. 32, 33, 34.)

As noted above, Mae J. Kelly's payment of the taxes gave ▉ plaintiff no notice of a change in the nature of the possession, for she had been paying them for three years before obtaining the deed from the parents. Her collection of the rent thereafter gave him no notice, for having set aside the house for the parents' benefit during their lifetime it was immaterial to him whether they occupied or rented it.

While under section 6935, Revised Codes, the recording of ▉ the deed from the parents to Mae and of the deeds incident to the bank loan constituted such notice as would protect a bona fide purchaser for valuable consideration whose deed had been recorded first, it could not take the place of actual notice to plaintiff of a change in the nature of her possession. The un-contradicted evidence indicates that the deed from the parents to Mae J. Kelly and from her to John J. Burke were given solely to supply additional security for the bank loan to Mae, and the evidence is absolutely uncontradicted that actual notice of the deeds was never brought home to plaintiff.

In justice to Mae J. Kelly it should be said that the evidence, including that of defendant, greatly preponderates in favor of the conclusion, not that she was attempting to defraud her brother, employer and benefactor, who had taken her into his home together with their parents, nor that she was claiming to have acquired the property from her parents in good faith in consideration of an agreement to support them, but that she wanted to be sure that the property would be kept available and would be used for that purpose during their lifetime.

Up to the time of the deed to defendant, the only wrong she had done plaintiff, so far as the evidence showed, was that she took advantage of her knowledge that record title was in the parents, to obtain a deed from them so as to use the property as security for her purchase of the adjoining premises. She

wronged him by subjecting his property to possible loss in case of the foreclosure of the mortgage, but there is no evidence that she intended to claim title as against him. Even that transaction seems to have been made without intent to interfere with plaintiff's purpose, since it is undisputed that the $4,600 premises were too large for the needs of the parents and herself, and that by acquiring the adjoining property for their use for $2,500, plaintiff's house could be rented and the proceeds devoted to the parents' benefit. Certainly, there is no evidence that she diverted the proceeds to her own use.

Furthermore, the evidence preponderates against the conclusion that by Mae's deed to defendant Mae intended to defraud plaintiff by bargaining away his property to defendant. Defendant's direct testimony, while vague, indefinite, and confused, fails to accuse Mae of that intention, and it is only her final redirect examination by means of leading questions which tends to that effect. She testified that she visited the family frequently while they were living at 221 Jackson Street, and later when they were living on the adjoining premises; that some of her visits were of one or two months, but that she had never learned who was paying the household expenses and had heard no discussion concerning household affairs or expenses, or concerning the circumstances of plaintiff's ownership of the premises or of his devoting it to the parents' use for life; she first testified that there was some discussion of the latter, then that there was "very little," then that she could not recall any; she knew that plaintiff had bought the property and that the parents had deeded it to Mae, but she did not know or ask how the parents happened to acquire it from plaintiff. She knew nothing of Mae's use of the property as security for the bank loan, but "assumed" that the parents had turned it over to her "so that Mae could take care of them." Pressed as to why she assumed it, she replied: "Well, I know that is what she really intended it for, * * *."

Defendant's only testimony purporting to show the conver-

sation between herself and Mae concerning the deed to defendant was the following:

"A. We had discussed it times before, but it didn't come up until she was sick, then it had always been understood, of course, that I was to take care of mother, and she, of course, wanted this property turned over to me to care for my mother. * * *

"A. She said she would like me to have the property fixed, because she said 'You never know in my condition,' and I said, 'What do you want done?' She said 'A deed made out to you,' she said 'You can have it and bring it down.' And I said 'Do you think there is any hurry?' And she said 'Well, I would be more contented.' So I went and got it."

She testified that this conversation was within a week of the execution of the deed shortly before Mae's death, and that they had never had any prior talks about it, then that "we didn't discuss it all the time," then that they did not discuss it at all before the conversation given above, then that she did not know whether all her discussions with Mae were in October, 1937 (when the deed was given), and finally that "we discussed it in earlier years, but I can't remember just when." Asked whether she could remember anything ever said between herself and Mae before October, 1937, concerning the property itself, she testified that years before her final illness, Mae was worrying about the recording of the deed from her parents to her. Shown that the parents' deed to her was made on April 4, 1922, and recorded the same day, she said, "Well, it could have been 1917, then," but asked what she meant by that, replied, "I don't know." Later defendant insisted that it was the deed from the parents which Mae wanted recorded, because she was afraid that otherwise Peter would go to the parents with some sort of a deed and they would not know what they were signing. These questions and answers followed:

"Q. Can you tell us any of the circumstances that caused her to make that statement to you? A. Only she would always have to take care of them and she figured she would have that

property to take care of them, and they always said they should have.

"Q. Who said? A. My mother and father.

"Q. That they said she should have the property for taking care of them? A. Yes, she was entitled to it.

"The Court: Well, is that what they said? A. She told me.

"Q. And with all that talk you didn't ask how the folks happened to get the property? A. No.

"Q. But you knew Peter had bought it? A. Yes.

"Q. Did you ask Mae whether anything had happened that in her opinion would cause Peter to do a thing like that? A. No.

"Q. After he had given the house to the folks once? A. No.

"Q. Weren't you curious? A. No, I wasn't. * * *

"Q. Now, from the way that Mae talked to you, do you wish the court to understand that Mae claimed that her folks had said that they didn't want Pete to have the property, and wanted Mae to have it? A. Wanted her to have it because they expected her to take care of them, and naturally they wanted her to have it, she said.

"Q. Did she say that is how they happened to give her a deed to the place? A. Yes. * * *

"Q. Now, can you recall any other talks that you had with Mae between the time of the talk which you have just related to the Court and the talk you had when Mae was in the hospital and which concerned having the deed made out? A. No.

"Q. These are the only two talks you can remember? A. Yes. * * *

"Q. Now, it is a fact, is it not, that you have told us all that was said between Mae and you with reference to what caused her to give you a deed to 221? A. Yes.

"Q. You have already told us that? A. Yes.

"Q. *And there was nothing else said and nothing else done about that transfer?* A. No."

Thus defendant's testimony of the conversations shows that there was no contract by which she acquired the property for valuable consideration, and it was only by words put into her

mouth by leading questions on a final redirect examination that such contract was suggested. That testimony was as follows:

"Q. Did you and Mae have a discussion about you taking care of the mother? A. Yes.

"Q. And it was Mae's intention and idea that you were to take care of the mother? A. Yes.

"Q. And for that and caring for the mother the rest of her life she was giving you that property? A. Yes, sir. * * *

"Q. And in that discussion she said she would give you that property in payment for the services you would render in taking care of the mother, and she was expecting you to take care of the mother? A. Yes, sir.

"Q. Have you done that since that time? A. Yes."

But even if there were such an agreement, the non-existence ▇ of which was indicated by defendant's own prior testimony, there would have been no sufficient consideration to support it as against the real owner of the property, since sections 5843 and 5853, Revised Codes, made it defendant's duty to maintain her indigent mother to the extent of her ability. That she had the ability to support her mother is shown by the fact that in addition to the rental value of plaintiff's property, which was $25 per month, she had been given her sister's adjoining property of an equal rental value and a worth of $3,000, and also insurance in an unnamed amount. She testified that the entire cost of her mother's support was $21 per month. The rental value of the two properties was over twice that amount, but if their net rents were nothing, the value of Mae's adjoining property was triply sufficient to support the mother for her remaining four years of life.

Section 7503, Revised Codes, provides that "any prejudice suffered, or agreed to be suffered, by such person, *other than such as he is at the time of consent lawfully bound to suffer,*" is a good consideration for a promise.

Section 7504, Revised Codes, provides that "an existing legal obligation resting upon the promisor * * * is also a good consideration for a promise," though only "to an extent corre-

.sponding with the extent of the obligation, but no further or otherwise." But that is not to say that it is such a consideration as to make defendant a *purchaser in good faith and for a valuable consideration,* so as to entitle defendant to plaintiff's property under the recording statute, section 6935, Revised Codes.

In the words of Chief Justice Brantly in *Foster* v. *Winstanley,* ▮▮▮ 39 Mont. 314, 102 Pac. 574, 579, "a bona fide purchaser is 'one who at the time of his purchase advances a new consideration, surrenders some security, or does some other act which leaves him in a worse position if his purchase should be set aside.' " etc. (*Helena & Livingston S. & R. Co.* v. *Northern Pac. R. Co.,* 62 Mont. 281, 205 Pac. 224, 21 A. L. R. 1080; *Yale Oil Corp.* v. *Sedlacek,* 99 Mont. 411, 43 Pac. (2d) 887.)

Thus, even if we consider defendant's testimony as showing that she received plaintiff's property from Mae J. Kelly in good faith in consideration for a promise to support her mother, she was not a bona fide purchaser so as to defeat plaintiff's title. Thus we need not consider the meaning of the proviso or limitation at the end of section 7504.

Nor do the equities support defendant, since a right of contribution from her brother would not justify her in acquiring his property without due process. While she testified that plaintiff had not contributed to the parents' support since his second marriage in 1919, it is undisputed that during the first two years he contributed to their household expenses and that during the rest of their lifetime he accorded them the right of possession and occupancy of the premises, of an admitted monthly rental value of $25. There can be no doubt that he discharged at least his part of the obligation, and that if he was indebted, even to Mae J. Kelly, who was most active in the care and support of the father for one year and the mother for eight, the defendant was more indebted, in view of her testimony that Mae furnished all the support. He was certainly not indebted to the defendant, who supported the mother only during the last four years, except possibly to the extent to which the net rental value

of his property may have been insufficient to supply his half of the $21 per month, in which case she had her remedy at law.

Defendant showed that in bankruptcy proceedings, apparently at some time after 1918, the plaintiff executed property schedules in which he stated that he owned no real estate nor reversionary or contingent interests therein. However that cannot alter the fact that by virtue of the deeds to his parents and the deed back to him he was the legal owner of the property; and while the bankruptcy schedules might constitute an admission of some subsequent circumstance or transaction by which his interest was divested, the parties make no claim that there was any such, and the record indicates that there was not.

We must conclude that Mae J. Kelly never acquired title to the property by adverse possession, that the defendant did not acquire it from her as a bona fide purchaser for valuable consideration, and that plaintiff is entitled to a decree quieting title in him.

The decree appealed from is therefore reversed, the cause remanded and a new decree ordered entered accordingly.

ASSOCIATE JUSTICES ERICKSON, ANDERSON and MORRIS concur.

MR. JUSTICE ANGSTMAN takes no part in the above decision.