FILED

03/14/2023

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 22-0362

DA 22-0362

IN THE SUPREME COURT OF THE STATE OF MONTANA

2023 MT 47N

CHRISTINA SCHMID and JENNIFER POWERS,

       Plaintiffs and Appellants,

  v.

JAE NOTTI, SUZIE NOTTI, and ET CATTLE COMPANY, LLC,

       Defendants and Appellees.

APPEAL FROM:    District Court of the Sixteenth Judicial District,
In and For the County of Powder River, Cause No. DV-38-2019-2587
Honorable Nickolas C. Murnion, Presiding Judge

COUNSEL OF RECORD:

      For Appellants:

           Amanda K. Roberts, J. Kyle Hendrickson, Erin E. Thimmesch, Lonabaugh and Riggs, LLP, Sheridan, Wyoming

      For Appellees:

           Afton E. Ball, Moulton Bellingham PC, Billings, Montana

Submitted on Briefs:  February 1, 2023

Decided:  March 14, 2023

Filed:

_____
Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, we decide this case by memorandum opinion. It shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2 Chris Schmid and her niece Jennifer Powers appeal the Sixteenth Judicial District Court's summary judgment order containing two adverse determinations about their rights to a piece of property in rural southeast Montana owned by Suzie and Jae Notti. The court concluded that although Chris lawfully possessed the property under a lease agreement, that agreement did not grant Chris a life estate interest in the property. The court also concluded that Jennifer did not lawfully possess the property because her use was an unauthorized transfer from Chris. Upon review of the lease agreement and the rest of the record, we affirm the court's order, concluding that Jennifer's use of the property contravenes the contracting parties' intent.

¶3 This case concerns a 47-acre parcel of land and its buildings and corrals located in Powder River County.[1] Gil Powers (Chris's father) and Bob Powers (Chris's uncle) originally owned the property as part of their greater landholdings. Chris and her husband Dave Schmid lived on the property in a homestead house known as the Kerr House from

---

[1] The parties stipulate that the parcel is defined as "Township 9 South, Range 45 East, M.P.M.; Section 27: Tract in NW 1/4 containing 47 acres more/less."

2

1981 to 1988, raising pigs. In 1988, the pigs got sick and died, and Chris and Dave moved to a nearby town.

¶4     After purchasing the Powers's redemption rights, the Nottis acquired approximately 8,000 acres of the Powers's land in 1990. The sale included the 47-acre parcel. Although Chris and Dave had moved two years earlier, they asked the Nottis if they could continue to use the Kerr House on occasion and keep a horse on the property. The Nottis agreed. On September 27, 1990, the Nottis and Schmids entered into the following handwritten and signed lease agreement (spelling and punctuation preserved):

> Aggreement between Jae Notti & Dave Schmid and Chris Schmid on lease of house and pasture.
>
> We aggree:
>
> a)  This is for Dave & Chris's lifetime
> b)  Dave & Chris will fence agreed horse lot consisting of ≃ 45 acres.
> c)  Schmids will reimburse Notti for property taxes on said house & land.
> d)  Schmids will pay own elec. bills
> e)  Schmids have use of corrals and aggree to help maintain - with no leaving horses in corrals for extend periods.
> f)  Nottis are not responsible for injury, loss, or livestock of Schmids
> g)  This agreement is not transferable without Notti approval.[2]

Per the agreement, the Schmids fenced the property, paid its electric bills and property taxes, and used the property part-time. Following Dave's death in 2007, Chris continued to pay the taxes and bills. She now lives in Wyoming and has not visited the property in years.

---

[2] The parties stipulated that this handwritten agreement, not the lease recorded in the county land records, was the controlling document in their summary judgment dispute.

¶5     In 1990, the Nottis also allowed Gil to stay on the parcel, purchasing him a double-wide trailer to live in. Gil was a family friend of the Nottis and had no money and nowhere to go at the time of the foreclosure sale. Gil lived in the trailer until his death in 2016. Since at least June 2019, Jennifer—Gil's granddaughter—has resided full-time in the trailer, which she now owns. Chris considers Jennifer a caretaker of the property who keeps an eye on the place, though the two have no formal agreement. Jennifer keeps a few horses on the property—one horse is hers and two are her father's.

¶6     On July 2, 2019, the Nottis sent an eviction notice to Chris and Jennifer to vacate the property and remove all personal property within fourteen days. In response, Chris and Jennifer filed a petition requesting a declaration that the lease agreement was valid and binding; that they were not in default under it; and that they were in lawful possession of the property. They also asserted various claims. The Nottis filed an answer and asserted counterclaims. The court dismissed several of the parties' claims by stipulation. The parties cross-moved for summary judgment on the remaining issues of whether the agreement granted Chris a life estate; whether Chris and Jennifer were in lawful possession of the property; and whether an award of attorney fees was warranted. The parties submitted briefing, and the District Court heard oral argument in April 2021.

¶7     The District Court held that the lease agreement did not grant Chris a life estate but did give her and Dave a lifelong lease of the Kerr House, corrals, and pasture on the property. The court concluded that those possessory rights were personal to Chris as the surviving tenant and that by allowing Jennifer to reside on the property (in a different home—the trailer) and use the corrals and pasture, Chris created an unauthorized sublease.

4

Chris thus was in default, although the court recognized that the lease agreement contemplated no termination process for default. Finally, the court found no statutory or contractual basis for an award of attorney fees to Chris and Jennifer, and they do not raise this issue on appeal. Because the court's summary judgment order did not dispose of all pending claims, the court entered a stipulated final order resolving pending claims in June 2022.

¶8 We review summary judgment decisions de novo. In doing so, we apply Rule 56 of the Montana Rules of Civil Procedure. *Barrett, Inc. v. City of Red Lodge*, 2020 MT 26, ¶ 6, 398 Mont. 436, 457 P.3d 233. According to Rule 56, a court should issue summary judgment if the record shows no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. When the material facts are undisputed, as they are in this case, courts identify the applicable law, apply it to the uncontroverted facts, and determine which party prevails. *See Barrett*, ¶ 6.

**Construction of the Lease Agreement**

¶9 We interpret a contract to give effect to the mutual intention of the parties as it existed at the time of contracting. *Harbeck v. Orr*, 192 Mont. 243, 249, 627 P.2d 1217, 1220 (1981) (citing § 28-3-201, MCA). The question of "what character or quantum of estate or interest is created" by an instrument that "purports to establish premises as a home for one or more designated persons[] is plainly one of the intent and true construction of the particular instrument." W.W. Allen, Annotation, *Quantum or Character of Estate or Interest Created by Language Providing Premises as a Home, or Giving or Granting Same for Such Use*, 45 A.L.R.2d 699, *1 (2023). In such agreements, "[a]ny one of a variety of

5

interests may be given and the interests may be variously qualified, limited, or conditioned," creating either a life estate or an interest less than a life estate such as "mere personal privileges." 45 A.L.R.2d 699, *1.

¶10   The instrument here was a handwritten, nontechnical document. It states explicitly that the parties' intent was to allow Chris and Dave Schmid—but no one else without the Nottis' approval—to "lease" the "house and pasture" for the Schmids' lifetime. The context at the time of signing also supports this intention. The Nottis were friends of Chris's family and had just acquired her family's land. The Nottis allowed Gil, who otherwise had no place to go, to live on the property in a trailer. The Nottis also allowed Chris and Dave to continue to stay occasionally at the Kerr House and to keep their horses temporarily in the corrals. The lease agreement, though informal, thus granted Chris and Dave a lifetime right to occupy the house and pasture but not to use it as a permanent residence.

¶11   The agreement bears some indicators typical of a life estate. It is for Chris and Dave's "lifetime." *See Leichtfuss v. Dabney*, 2005 MT 271, ¶ 34, 329 Mont. 129, 122 P.3d 1220 (explaining that a life estate is an interest in real property, the duration of which is limited by the life of some person) (citing 2 Thompson on Real Property § 19.02 (2022)). It requires the Schmids to pay the property taxes and electric bills. *See Collier v. Kincheloe*, 2008 MT 100, ¶ 13, 342 Mont. 314, 180 P.3d 1157 (explaining that owners of life estates are responsible for paying the taxes on the property).

¶12   But the agreement lacks several other markers typical of a life estate. For example, life estate holders are entitled presumptively to rents and profits of the property during their

6

lifetimes. *Thompson v. Flynn*, 95 Mont. 484, 494, 27 P.2d 505, 507 (1933). The record contains no indication that the parties believed that the Schmids could rent the Kerr House to someone else, sublease the pasture, or farm the land and profit from the crops. The Schmids also did not have an "exclusive" right to the property—as evidenced by Chris's understanding that the corrals were to be used by the Nottis as well. *See* 2 Thompson on Real Property § 19.04 (2022) (stating that a life tenant has the "exclusive right to possession of the property during the continuance of the life estate"). And in her deposition, Chris Schmid was asked if she thought she had an ownership interest in the property. She responded, "Well, I--it is a lifetime lease. I--I know you can't list it as collateral. You can't sell it or anything like that. But other than that, in my mind, it's my home." Finally, the agreement includes no legal description of the property. *See Blazer v. Wall*, 2008 MT 145, ¶ 36, 343 Mont. 173, 183 P.3d 84 (observing that "a land description is a necessary inclusion in an instrument conveying title").

¶13 The District Court correctly concluded that the lease agreement did not create a life estate but plainly granted Chris the right to occupy the Kerr House and to use the corrals and pasture for the rest of her life. *See Kelly v. Grainey*, 113 Mont. 520, 527-28, 129 P.2d 619, 623 (1942) (holding that an oral agreement did not create a life estate but was "understood by all" to grant use and possession).

**Unauthorized Transfer of the Lease Agreement**

¶14 Jennifer's residing on the property with Chris's permission, whether characterized as a formal sublease or transfer of a right of possession, violates the plain terms of the lease agreement. The agreement states that it "is not transferable without Notti approval." Chris

7

and Jennifer argue that there has been no transfer but rather that Chris simply allows Jennifer to use the property and look after it. Even if the lease agreement contemplates Chris's ability to have guests on the property—such as a caretaker, cleaner, or visitor—Jennifer's use exceeds such visitation. Jennifer resides full-time on the Nottis' property in a building different from the house indicated in the agreement. She keeps three horses full-time on the Nottis' property, none of which are owned by Chris. The District Court properly concluded that Jennifer's use contravenes the contracting parties' intent, that Jennifer is not in lawful possession of the property, and that Chris is in default. As noted, the District Court determined that the agreement contains no termination process for default; the Nottis have not cross-appealed this ruling.

¶15 We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions. This appeal presents no constitutional issues, no issues of first impression, and does not establish new precedent or modify existing precedent. The District Court's summary judgment order is affirmed.

/S/ BETH BAKER

We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ DIRK M. SANDEFUR
/S/ INGRID GUSTAFSON
/S/ JIM RICE

8