STATE, RESPONDENT, *v.* MUMFORD, APPELLANT.

(No. 5,379.)

(Submitted January 8, 1924.   Decided January 16, 1924.)

[222 Pac. 447.]

*Criminal  Law—Homicide—Witnesses—Recalling  for  Further Cross-examination — Discretion — Evidence — Exhibits— Harmless  Error—Manslaughter—Instructions.*

Trial—Witness—Recalling for Further Cross-examination—Discretion.
  1.  Permission to recall a witness for the state for further cross-examination rests in the sound discretion of the trial court.

Homicide—Refusal to Permit Witness to be Recalled—Exhibits—Admissibility—Harmless Error.
  2.  Where defendant, charged with murder, was convicted of manslaughter, refusal of the court to permit a witness for the state to be recalled for further cross-examination for the purpose of impeaching another witness who had testified to the finding of a bullet in the ground where the head of the deceased was lying, presumably offered for the purpose of showing that the shot was fired by defendant

while standing over the prone body of his victim and thus showing malice, whereas defendant claimed to have fired the shot from a distance, *held* not abuse of discretion, but if error, *held* harmless, as was also the admission of the bullet itself, in view of the verdict of manslaughter, showing that the jury disregarded the element of premeditation or malice.

Same—Instruction on Manslaughter—When Required.
3. Where there is evidence showing defendant to be guilty of either murder of the first or second degree or manslaughter, the court must explicitly instruct the jury that a verdict of manslaughter may be returned, under the rule that where the evidence warrants it, instructions must be given upon every offense included in the crime charged.

Criminal Law—Appeal—Prejudicial Error not Presumed.
4. Prejudicial error will not be presumed on appeal in a criminal action, the burden resting on accused affirmatively to point out any error committed by the trial court.

*Appeal from District Court, Valley County, C. D. Borton, Judge.*

WILLIAM MUMFORD was convicted of manslaughter and appeals from the judgment and the order denying a new trial. Affirmed.

*Messrs. Norris, Hurd, Rhoades & Hallett,* for Appellant, submitted a brief; *Mr. H. C. Hall,* of counsel, argued the cause orally.

Under the provisions of section 11969, Revised Codes of 1921, and like statutes, it has been held that it is within the sound discretion of the court to permit one to reopen his case and offer further evidence. (*Beirne* v. *Modern National Reserve,* 42 Mont. 332, 111 Pac. 1032; *State* v. *Hedican,* 35 Mont. 381, 89 Pac. 730; *State* v. *DeHart,* 38 Mont. 211, 99 Pac. 438; *Schilling* v. *Curran,* 30 Mont. 370, 76 Pac. 998.) The discretion to be exercised by the court must be sound and legal; otherwise error is committed. (See *State* v. *Jones,* 80 Wash. 588, 142 Pac. 35; *Mandosa* v. *State,* 88 Tex. Cr. 84, 225 S. W. 169; *White* v. *State* (Tex. Civ.), 150 S. W. 609; *Dickinson* v. *State,* 3 Okl. Cr. 151, 104 Pac. 923; *Martin* v. *Commonwealth,* 145 Ky. 752, 141 S. W. 54.) In 16 C. J., 871, it is said: "Where it appears, on an application to reopen a case to permit the introduction of further testimony, that the proposed

testimony is of substantial importance to defendant, the application should be granted." (*Stone* v. *State*, 91 Tex. Cr. 373, 239 S. W. 209; *People* v. *Oxnam*, 170 Cal. 211, 149 Pac. 165; *State* v. *Martin*, 102 Miss. 165, 59 South. 7; *Elsworth* v. *State*, 52 Tex. Cr. 1, 104 S. W. 903.)

The court erred in admitting the bullet, state's Exhibit 6, found at the place of the killing. It appears without contradiction that the only weapon appellant used was a 30–30 Winchester rifle. Nowhere does it appear what was the caliber of the bullet found, nor whether it was even similar to other bullets owned by appellant. For such reason appellant contends that the foundation laid for the admission of the bullet was wholly insufficient. (*Hickey* v. *State* (Tex. Cr.), 76 S. W. 920; *State* v. *Chin Ping*, 91 Or. 593, 176 Pac. 188; *Hardley* v. *State*, 202 Ala. 24, 79 South. 362; *Commonwealth* v. *Puntario*, 271 Pa. 501, 115 Atl. 831; *Commonwealth* v. *Du Boise*, 269 Pa. 169, 112 Atl. 461; *Franklin* v. *State*, 153 Ark. 536, 240 S. W. 708; *People* v. *Smith*, 61 Cal. App. 259, 214 Pac. 468.)

*Mr. Wellington D. Rankin*, Attorney General, and *Mr. L. V. Ketter*, Assistant Attorney-General, for the State, submitted a brief; *Mr. C. H. Roberts*, County Attorney of Valley County, argued the cause orally.

The cases cited in appellant's brief under the caption of "Right to Reopen Case" are not in point, for the reason that the question of reopening the defendant's case was not before the court, but the request was to further cross-examine one of state's witnesses, which involved reopening the state's case for the benefit of the defendant. The cases quoted in appellant's brief under this heading all have reference to reopening the case of the person making the request, to permit additional direct evidence to be introduced by him. None of the cases support the theory that it is an abuse of discretion for the court, under the circumstances present here, to refuse to reopen the state's case to permit further cross-examination by the defendants of one of the state's witnesses.

On this point we cite *People* v. *Keith,* 50 Cal. 137; *Moeller* v. *People,* 70 Colo. 223, 199 Pac. 414; *Fowler* v. *Town of Strawberry Hill,* 74 Iowa, 644, 38 N. W. 521; *United States Wringer Co.* v. *Cooney,* 214 Ill. 526, 73 N. E. 803; *State* v. *Eberhart,* 134 Ind. 651, 34 N. E. 651; *People* v. *Shaw,* 111 Cal. 171, 43 Pac. 593.

It is claimed that the bullet was inadmissible in evidence because its caliber was not shown to correspond with the 30–30 'Winchester rifle owned by the deceased. The bullet was found in the ground under the blood spot where deceased's head had lain. The body was lying upon the back and the back of the head was torn open with brains and blood scattered about. The agency of death (the bullet) had, therefore, gone completely through the head. Finding a bullet in the ground upon which the head had lain,. therefore, was finding at the scene of the crime an agency of death by which the crime was or might have been committed. It is always proper to show this, and it is not necessary to connect it with the accused in order to render it admissible. (16 C. J. 619; *People* v. *Sampo,* 17 Cal. App. 135, 118 Pac. 957; *People* v. *Byrne,* 160 Cal. 217, 116 Pac. 521; *Roberts* v. *State,* 123 Ga. 146, 51 S. E. 374; *State* v. *Sherouk,* 78 Conn. 718, 61 Atl. 897; *Crawford* v. *State,* 112 Ala. 1, 21 South. 214; *State* v. *Wilson,* 223 Mo. 173, 122 S. W. 671.) Only a *prima facie* showing of identity and connection with the crime is necessary and sufficient. (*State* v. *Davis,* 60 Mont. 426, 199 Pac. 421; *People* v. *Byrne, supra; People* v. *Szafesur,* 161 Cal. 636, 119 Pac. 1083.)

MR. JUSTICE GALEN delivered the opinion of the court.

On the morning of April 11, 1923, Hale Talbot, a neighbor of the defendant, was shot and killed by the latter. There were no eye-witnesses to the homicide other than the defendant, and the testimony against him consisted chiefly of his admissions made to various persons after the tragedy and circumstantial evidence in connection therewith.

The body of the deceased was found on the south bank of Rock Creek, on land leased or owned by the defendant near the latter's place of abode, as he had described the situation to several parties to whom he told the story of the homicide. In substance he said to several persons that he had had trouble with neighbors cutting the fences inclosing his land, and that on the day of the shooting he saw a person on horseback riding down Rock Creek. He then got his field-glasses, and by use thereof observed the rider going down to the corner of defendant's fence, where there was no gate. The defendant observed the rider dismount and begin to pull and jerk at defendant's fence. The defendant then laid aside his field-glasses, took up his Winchester 30–30 rifle and proceeded to his barn, where he saddled a horse, mounted it, and started in the direction of the intruder. He said that the sun was shining in his eyes as he approached the deceased, so that he was unable to recognize the latter. On getting within speaking distance the defendant dismounted, and accused the deceased of cutting down the former's fences, which charge Talbot, who was then standing on the ground, with an oath denied, reached down, picked up his rifle, and fired a shot at the defendant, which passed close to the side of defendant's head. The defendant said he became frightened when the deceased shot at him, and began shooting at the deceased, still not knowing the latter's identity; that the first shot apparently took effect, and after being hit Talbot fell to the ground, but immediately attempted to get up, retaining his gun in his hands, and under the circumstances the defendant kept shooting until the deceased lay still. During the time of the shooting Talbot was on the south side of the creek and the defendant was on the north side, he said, and that when the deceased showed no further signs of movement the defendant crossed the Creek to where the body lay, and then ascertained for the first time that it was that of Hale Talbot. The defendant stated that he then recrossed the creek and proceeded to his home without

in any manner disturbing Talbot's body, and after arrival at his house finished up his chores and then proceeded to Theoney to give himself up. A party consisting of several witnesses for the state went to the scene of the tragedy after learning about it, and there found Hale Talbot lying dead, with his rifle, a 22-caliber, lying by his side, the muzzle pointing toward his feet and his feet toward the creek. There were two blood spots at the place where the body lay, one underneath his head and one underneath the left leg. There was no sign of a hand-to-hand combat. Talbot lay on his back at right angles to the course of Rock Creek, about eighteen feet from the high-water mark thereof. His hat was off his head and some distance away, the hat-band being apart from the hat. On his hands were canvas gloves, the one on the right hand being partly off. Two wounds were apparent, one in the leg and the other through his forehead. Blood mixed with brains and tissue lay underneath the head, leaving at that place a large blood spot upon the ground. The ground was practically level, with little grass or verdure in the vicinity. In Talbot's rifle there was found one exploded 22 short shell in the chamber, and eleven like shells unexploded in the magazine. The statements made by the defendant generally as to the position of the body and its condition were found to be correct.

After investigation so made the body of the deceased was put into a wagon and hauled to his home, about two miles distant, where it was placed in a granary and left there overnight and the day following. While there it was viewed by several persons, including the sheriff, county attorney, and coroner. No powder marks were visible upon the body. On April 13 the remains were taken to Glasgow and an autopsy held. The bullet wounds upon the body of the deceased were described by Dr. Hoyt, who performed the autopsy, as follows: "We found bullet wounds; one entered eight inches above the knee and below the center and came out on the outside of the thigh of the left leg about five inches below the hip-bone. It * * * did not break the bone. There was another bullet wound. The point of entrance was an inch and a half above

the navel and about four inches to the left thereof, and it came out about an inch and a half higher than the point of exit if the body had been perpendicular. On the right side of the neck there was a bruise. We did not know what that was. We extracted blood from it. * * * There was another wound in the forehead, to the right of center, that was ragged, not round, and was about midway between the hair line and eyebrow and a little to the right of center, and as large, perhaps, as an inch and a half in diameter, while the exit at the back of the skull and head had been blown open. The tear in the skull extended from the corner of the eye, back of the wound was laid clear open, and brains were practically missing. * * * The skull was shattered into a great many pieces from an inch to two and a half inches in diameter. The bones of the face were broken so that on pressure you could hear them grate together. The base of the skull was fractured.''

The defendant was charged by information with the crime of murder, and upon his plea of not guilty was tried by a jury which returned its verdict finding him guilty of manslaughter, and fixing his punishment at imprisonment in the state penitentiary for not less than five nor more than ten years. Judgment was entered accordingly. The defendant has prosecuted this appeal from the judgment and from the order made denying his motion for a new trial.

The assignments of error present three questions for determination, which will be considered in their order.

1. Did the court err in refusing to permit the defendant [1, 2] to recall the state's witness Haydon for further cross-examination after the close of all of the evidence? At the trial it appeared in the state's case in chief that on April 13, 1923, the scene of the homicide was visited for further investigation by Milton Talbot, a brother of the deceased, John Alexander Watson, George Clark, Fred Knott and others. All of those named testified in substance that there was a large blood spot about a foot in diameter where the head of the deceased had lain, filled with particles of bone, brains and

hair. The blood and gore on the spot had hardened, and Milton Talbot borrowed Fred Knott's jackknife with which he probed around in the ground in the center of the blood spot, and at the depth of about one inch or an inch and a half removed a bullet, state's Exhibit 6, which was in evidence. Dr. Arthur Henrici, to whom the bullet was delivered for examination by Sheriff Haydon, made an analysis and microscopic examination of it, and determined as a result thereof that human blood was present thereon, also "some small fragments of vegetable fiber and a particle of bone tissue."

A witness for the defendant, Otis A. Hallett, one of defendant's attorneys on the trial, testified that he, together with Sheriff Haydon, and several others named, visited the scene of the homicide on the afternoon of April 12, 1923. He says: "The area the blood stain covered probably was ten or twelve inches wide, and possibly eleven to fourteen inches long; as I remember, it was slightly oval in shape. At that time the blood stain was still wet; there were clots of blood there, of course, and small particles of matter that looked like brains or tissue or something.

"Q. At that time did you, or not, see anybody digging down underneath about the middle point of that blood stain? A. I first noticed Sheriff Haydon; he was stooping down, rather in this fashion, and he appeared to have a match in his hand scratching around through it, and, as I stated I was there to see what I could see, and I stooped over his shoulder and watched him, standing in this position, leaning over his shoulder; he apparently scratched all through it, and turned over particles of blood, by seeing what was in there, so; I don't mean blood, but clots and particles that looked like brain and tissue. Mr. Haydon and I came there to that point together. I saw the beginning of what examination was made at that place. At that time there was no hole. After Mr. Haydon had made the investigation I made an investigation of the same point. I took a short piece of sage-brush I picked off, and after Mr. Haydon left the spot I stooped down and

·dug around in practically the same manner as he had done with the match. At that time there was no hole in the ground. I was engaged possibly a couple minutes in testing it out; maybe not that long.''

After the defendant had rested his case Sheriff Haydon was recalled by the state in rebuttal and testified: That he was present "on the twelfth day of April, 1923, at a place where a blood spot was found. I heard Mr. Hallett's testimony with reference to that blood spot yesterday. I heard his statement that he and I had dug through the blood spot and what was upon the ground. That is not a fact. I did not dig into it. Mr. Hallett in my presence did not dig into it. Q. Did you see anybody else picking into what is there— that crust—while you were there? A. No, sir.'' He was then subjected to cross-examination by defendant's counsel.

The state recalled three other witnesses in rebuttal, and then rested its case. Whereupon George E. Hurd, of counsel for the defendant, requested to be permitted to recall the witness Haydon for further cross-examination, for the purpose of showing contradictory statements made by him relative to his having dug in the blood stain, which request was by the court denied. Mr. Hurd then made offers of proof, which the court denied as follows: "At this time the defendant asks the court for leave to recall for further cross-examination the witness J. W. Haydon, who testified in rebuttal this morning, and in that respect the defendant offers to show and by the sworn evidence that after the witness Haydon left the stand in rebuttal on this morning there came to the attention of counsel for the defendant for the first time certain statements materially affecting the testimony which was given by the witness, Haydon, which statements have reference to his contradiction of himself, and which are, as follows: To a witness James R. Stephens on yesterday, after Mr. Hallett had testified in the case concerning the place and the looking at the blood spot as shown by the evidence in this case, and Mr. Haydon made the following statement to Mr. Stephens, 'Damn it, Hallett did me a great injustice; he

stated, I broke off a piece of sage-brush and dug in that spot';
to which the witness Stephens replied, 'You are mistaken;
Hallett said he used a piece of sage-brush and you dug with
a match,' to which the witness Haydon replied to Mr. Stephens,
'Well. I did do that; there was brains there, and blood, and I
wanted to see what was in it.' '' ''I also offer to testify on
the witness-stand that the information which came to us
after the witness Haydon left the witness-stand was not known
to us until after he had left the witness-stand, and that there
was nothing heretofore suggested in the case which would
cause us to make any inquiry as to any statement which the
witness Haydon might have made concerning Mr. Hallett's
testimony." "And we offer also to prove, if the court please,
that from the moment there was a suggestion came to our at-
tention to the effect that Mr. Haydon had made such state-
ments as now are known to contradict him, that we have been
diligent in endeavoring to get the exact facts concerning his
statements, and we have obtained such facts since the witness
Haydon left the witness-stand." "And we further offer to
prove by myself as a witness that the information in the form
in which it is did not come to our attention until the last
witness was testifying; that it was after I had cross-examined
him that my attention was called to the exact evidence which
would be presented, and before I had the opportunity to ask
leave of court to recall the witness."

The statute provides that, after the examination of a wit-
ness by both sides has been once concluded, a witness cannot
be recalled without leave of the court, and such leave is
granted or withheld in the exercise of a sound discretion.
(Sec. 10667, Rev. Codes 1921.) Murder, the crime with which
the defendant was charged, is the unlawful killing of a
human being with malice aforethought (*Id.,* sec. 10953), and
such malice may be express or implied. "It is express when
there is manifested a deliberate intention unlawfully to take
away the life of a fellow-creature. It is implied, when no
considerable provocation appears, or when the circumstances
attending the killing show an abandoned and malignant

heart," (*Id.*, sec. 10954), while manslaughter, the crime for which the defendant stands convicted, "is the unlawful killing of a human being without malice." It is either "voluntary, upon a sudden quarrel or heat of passion," or involuntary when committed in connection with an unlawful act not amounting to a felony, or in the commission of a lawful act which might produce death in an unlawful manner or without due caution or circumspection. The court properly instructed the jury, respecting the crime of murder and the degrees thereof, and also as to the lesser crime of manslaughter included within the greater offense. It was for the jury to determine from the law and the evidence whether the accused was guilty of the greater or lesser offense as defined by the court's instructions.

Assuming the further cross-examination of the witness Haydon to have been for the purpose of impeachment, as is inferred from the offers of proof submitted, yet there is no showing made of whether Mr. Stephens would testify, or, if called, what his testimony would be. Granting that Stephens would have testified that Haydon stated to him that which is shown by the offer of proof, it would not, in our opinion, materially affect the credibility of Haydon's testimony. The proposed cross-examination, as shown by the offers of proof, relates to a wholly immaterial matter, and it is evident that the finding of the bullet imbedded in the ground at the spot where the deceased's head had lain was given no consideration by the jury, as is demonstrated by its verdict. The testimony respecting the finding of the bullet could have been offered by the prosecution only on the theory of proving malice; that is to say, that the defendant fired the fatal shot while the deceased lay prone and helpless on the ground. We are clearly of opinion that the court committed no abuse of its discretion in refusing to permit the defendant to recall the witness Haydon for recross-examination under the circumstances.

2. The next assignment of error to be considered relates to the admission in evidence of the bullet, state's Exhibit 6.

[69 Mont. 424.]

For the reasons heretofore stated, the admission of the bullet in evidence, if error, which we do not concede, was nonprejudicial. The homicide was admitted, and the question before the jury was whether it was justifiable or not, and the degree of the crime, if any committed, *viz.*, whether murder in the first degree, murder in the second degree, as defined by section 10955, Revised Codes of 1921, or manslaughter. (*Id.*, sec. 10959.) By its verdict the jury determined (1) that the homicide was not justifiable; (2) that it was committed without malice aforethought; (3) that, though unlawful, it was (4) committed upon a sudden quarrel or in the heat of passion. It is apparent, therefore, that the jury did not accept the state's theory respecting the finding of the bullet in proof of premeditation or malice, and it may have adopted the version of defendant that the bullet was placed where it was found after the removal of the body of the deceased, or they may not have been satisfied beyond a reasonable doubt on either theory, and given the defendant the benefit. In either event the defendant is not in position to complain.

3. The third and last error alleged is with reference to the court's refusal to give to the jury defendant's proposed instruction to the effect that the evidence is insufficient to justify the return of a verdict of manslaughter, and that therefore that charge is withdrawn from the jury's consideration.

The evidence amply warranted the submission to the jury [3] of the question of whether the defendant was guilty of the crime of manslaughter, and therefore, in our opinion, no error was committed by the court in denying this proposed instruction. Where, as in the case before us, there is evidence tending to show the defendant to be guilty of murder in the first or second degree, or of the crime of manslaughter, it is the duty of the court to explicitly instruct that a verdict of manslaughter may be returned. (*State* v. *Shadwell,* 26 Mont. 52, 66 Pac. 508.)

Whenever the evidence warrants it, the duty of the court is to instruct the jury upon every offense included in the crime charged. (*State* v. *Calder,* 23 Mont. 504, 59 Pac. 903;

*State* v. *Fisher*, 23 Mont. 540, 59 Pac. 919; *State* v. *Howell*, 26 Mont. 3, 66 Pac. 291; *State* v. *Shadwell*, *supra*.) Prejudicial error will not be presumed on appeal [4] in a criminal action, the burden resting upon the appellant to affirmatively point out the error, if any, committed by the trial court. (*State* v. *Kremer*, 34 Mont. 6, 85 Pac. 736.)

Finding the assignments of error made by the defendant without merit, the judgment and order are affirmed.

*Affirmed.*

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES HOLLOWAY and STARK concur.

MR. JUSTICE COOPER, being absent, takes no part in the foregoing decision.