No. 00-170

IN THE SUPREME COURT OF THE STATE OF MONTANA

2001 MT 122

JOSEPH A. GUTHRIE, JR., and CAROL W. GUTHRIE,

Plaintiffs and Respondents,

v.

BRETT F. HARDY,

Defendant and Appellant.

CHESTER L. KRAGE, DIANE D. KRAGE,

JOSEPH A. GUTHRIE, JR., and CAROL W. GUTHRIE,

Plaintiffs and Respondents,

v.

BRETT F. HARDY, LINDA MARIE DALEY KLINE

k/n/a LINDA M. WESTBY, MERVIN O. ERIKSSON,

TOLLY J. ERIKSSON, WALTER W. MILLER,

MARVIN L. WALLIN, PAULETTE WALLIN,

MATTHEW K. ARNO, and KENNETH D. HAYES,

Defendants and Appellants.

APPEAL FROM: District Court of the Fourth Judicial District,

In and for the County of Missoula,

The Honorable Douglas Harkin, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

George C. DeVoe, Missoula, Montana

For Respondents:

Robert Terrazas, Mulroney, Delaney & Scott, Missoula, Montana

Submitted on Briefs: September 21, 2000

Decided: July 23, 2001

Filed:

_____

Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 Following trial of consolidated cases, the District Court for the Fourth Judicial District, Missoula County, entered findings of facts, conclusions of law, and order from which the Appellants appeal. The remaining Defendants and Appellants, Brett F. Hardy, Walter W. Miller, and Matthew K. Arno (hereinafter Hardy, Miller and Arno, or Appellants), contend that the District Court erred in relying on findings unsupported by evidence, reached conclusions contrary to law, and abused its discretion in issuing an injunction.

¶2 We affirm and remand for further proceedings consistent with this opinion.

¶3 Recognizing that superfluity does not vitiate, *see* § 1-3-228, MCA, we nevertheless reduce Appellants' 144-word statement of their first issue to:

1. Did the District Court determine the scope of Appellants' easement, and that Appellants exceeded the scope and therefore burdened the servient estate, based on substantial credible evidence?

Appellants also raise the following issues which we have likewise tailored for clarity:

2. Did the District Court apply the correct law in determining the proper scope of the Appellants' easement?

3. Did the District Court err in limiting Hardy's use of the easement to ingress and egress, and therefore improperly enjoin him from performing maintenance, repair and improvements?

4. Did the District Court err when it concluded that the use of the easement by more than three residences would overburden the servient estate?

## FACTUAL AND PROCEDURAL BACKGROUND

¶4 This dispute involves real property located in Missoula County in the Nine Mile Valley near Huson, Montana. Specifically, the property dispute involves parcels of land and appurtenant easements located in the northwest and southwest quarters of Section 12, Township 15 North, Range 23 West, P.M.M.

¶5 The conflict at issue basically began in 1995, when Hardy and Miller sought to improve a portion of an easement located on Joseph A. and Carol W. Guthrie's (the Guthries) property located in the northwest quarter of Section 12. The Guthries own approximately 90 acres of the northwest quarter, which they purchased in 1990, and Chester L. and Diane D. Krage (the Krages) own approximately 70 acres, which they purchased in 1995. The parcels owned by each are irregular in shape, and generally conform to the topography, which is wooded and hilly. The Krage property occupies the northwest region of the quarter, whereas the Guthrie property covers the northeast, southeast and extends to the southwest corner of the quarter section.

¶6 No one disputes that Hardy was granted an easement across the northwest quarter in 1977, when he acquired the entire southwest quarter of Section 12 from Oscar and Marilyn Hauge, who are the Guthries' and Krages' predecessors. The easement also included a right of way through Section 1, which lies north of Section 12, where it leaves a

public road, Pine Meadows Lane, heads south across Nine Mile Creek, and enters the northeast corner of the northwest quarter of Section 12. The Hauges also reserved an easement across Hardy's property in 1977. The 1977 Warranty Deed describes the easements as follows:

> TOGETHER WITH an easement over and across the Southeast one-quarter of the Southwest one-quarter of Section 1 and the Northwest quarter (NW1/4) of Section 12, Township 15 North, Range 23 West, which easement shall be from Pine Meadows Lane across the Nine Mile Creek and thereafter shall cross the North 60 feet of the East 511.20 feet of the Northwest quarter (NW1/4) thence South along the East 60 feet of the Northwest quarter to a point which intersects a road presently situated on said premises and which road will provide access to the property agreed to be bought and sold.

> Reserving unto the Grantors, their heirs, successors and assigns an easement over and across the property above described along the present Cromwell Creek Road and an existing logging road connected thereto which generally crosses the North one-half (N1/2) of the Southwest one-quarter (SW1/4) of said Section 12, Township 15 North, Range 23, P.M.M.

¶7 After acquiring the southwest quarter of Section 12, Hardy subdivided it into eight 20-acre parcels in 1981, and eventually sold two parcels each to the Appellants Miller (the 40-acre southwest quarter in 1986), and Arno (the 40-acre northwest quarter in 1995). At the time this dispute arose, Hardy and Miller had also become joint owners of the 40-acre northeast quarter of the southwest quarter, which lies directly south of the Guthries' property. Both Miller and Arno would eventually join Hardy in this dispute in seeking to improve the easement. All three currently reside year-around on their respective parcels of land. No residences have been built on the northwest quarter, although the facts indicate that Hardy and Miller have cleared two building sites.

¶8 The facts indicate that up until the time this dispute arose, Hardy, Miller and Arno accessed their respective parcels from the south, and the Guthries and the Krages accessed their properties from the west via an access point not at issue. The Guthries and Krages, however, use a portion of the existing easement road to access their respective properties.

¶9 The original easement road was an old narrow logging road, which generally meandered through the northwest quarter, with sharp switchbacks, until it finally exited

through the southeast corner of the quarter section. In 1995, Hardy and Miller sought to improve the easement at issue so that it would accommodate regular year-around access to the southwest quarter. By then, a steep "short cut" had been established that cut off a loop of the original road, and a new exit road leading into the southwest quarter diverged from what had become the Guthrie's driveway.

¶10 It was the latter portion of the old logging road--which had by then become overgrown with trees and was fenced off--that Hardy and Miller attempted to access via the Guthries' driveway in June of 1995. Neither Hardy nor Miller had received permission from the Guthries to enter their property and explore the old logging road. Hardy had, apparently, informed the Guthries of his intentions. In turn, the Guthries alleged they refused to give him permission to access their property. A confrontation ensued between Carol Guthrie and Hardy and Miller, after they entered the Guthries' driveway and drove across their lawn.

¶11 After the confrontation, a general cloud of friction descended on the parties regarding exactly what Hardy, as the easement owner, could or could not do as far as expanding or improving the easement road. In part, the dispute involved the access road from the north, where it crossed the Nine Mile Creek, as well as a small tributary creek. The small wooden bridge across the latter often was under water during the spring and therefore impassable. Also, the larger bridge over the main creek was in need of repair, and, following a general improvement by the Guthries, fell into disrepair again in the midst of this dispute following a particularly high runoff in 1997. The recommended gross vehicle weight for the bridge was 6,000 pounds. The Guthries secured the bridge from public use with a locked gate.

¶12 Throughout this dispute, the Guthries and Krages voiced their concern that the Appellants wished, in fact, to extensively improve the easement road to accommodate further residential development as well as logging in the southwest quarter. Thus, they contended that more than merely establishing a reliable alternative access route for the benefit of the three Appellants was at issue. Rather, they claimed their rights would be burdened by the planned increased use placed upon the easement, which would necessitate a dramatic increase in the size and quality of the road itself to sustain such use. The facts indicate that although entering the northwest quarter as a 60-foot easement, the existing road identified in the deed was at best 12 to 14 feet wide, and simply could not, according to uncontested expert opinion, be expanded to accommodate heavy use without a major reconstruction or re-routing effort. The Guthries and the Krages--who would testify that

they wished to place some of their respective property into conservation easements-- argued that such an expansion of the easement was clearly not contemplated at the time the easement was granted, and was not supported by any historical use of that nature.

¶13 On the other hand, Hardy would argue--and continues to argue--that the easement was unrestricted and that such improvements and expanded use by him and his successors was clearly contemplated. According to his testimony throughout this dispute, he contends that it is his easement--i.e., his property right--and he can therefore do with it whatever he pleases. He points to the fact that his grantor, Hauge, had subdivided his quarter as well-- into seven tracts--which would eventually come into the hands of two owners, the Krages and the Guthries. Further development was clearly on the minds of both the grantor and grantee at the time the easement came into existence in 1977, according to Hardy.

¶14 Following a January 10, 1996 hearing, the District Court, on February 14, 1996, partially granted the Guthries' request for an injunction. The court ordered that Hardy was permanently enjoined from using the Guthries' driveway which led to the abandoned logging road. The court also enjoined his use of the "loop" which currently provides access to the Krages' property. Essentially, the court established as a matter of law the location of the easement, which was identified in court exhibits as the "orange" easement road--which was the color of marking pen used to trace it in on one particular photo.

¶15 With the location established, the court further enjoined Hardy from performing "any activities upon this easement except for access and egress, and this shall be at a reasonable speed, not to exceed twenty (20) miles per hour and less as is appropriate to travel conditions."

¶16 The court also resolved the related dispute involving the Guthries' gate at a bridge on the north end of the easement, where the road, in Section 1, crosses Nine Mile Creek and enters Section 12. The Guthries accused Hardy of not locking the gate and purposely leaving the gate open. The court ordered that Hardy follow the Guthries' instructions in keeping the gate locked. The court also prohibited gross vehicle weights in excess of 6,000 pounds, which was the recommended weight posted on the Nine Mile Creek bridge.

¶17 In many respects, the court-ordered injunction was merely the beginning of the dispute at bar, rather then the beginning of the end. For example, both Miller and Arno were not involved, and would assert that the injunction should not prevent them, individually, from asserting their rights to use and improve the easement road as Hardy's

grantees. All three Appellants attempted to initiate improvements on the easement following the court-ordered injunction. The Guthries and Krages would allege that Hardy, in particular, actually increased his use of the road, and extended permission to several guests to use the road as well. They also alleged that bulldozer work on the Hardy-Miller northeast quarter of the southwest quarter encroached upon their property by 200 feet.

¶18 Needless to say, this matter proceeded into full-scale litigation as the parties could not achieve any sort of accord as to the future use of the easement, and, in fact, the conduct of the parties, particularly between Hardy and the Guthries, became hostile.

¶19 This matter was tried before the District Court without a jury on September 15 and 16, 1999. On November 22, 1999, the court entered its findings of fact, memorandum of law, conclusions of law, and order.

¶20 The court concluded that the permanent injunction granted on February 14, 1996, would continue in full force and effect. The court determined that Hardy had intentionally violated the order of permanent injunction by performing work on the easement road with a bulldozer, and had not complied with the order regarding the gate to the easement road located at the north end in Section 1. The court observed that Hardy had, in fact, intentionally antagonized his neighbors, and "has no intention of obeying Court orders."

¶21 Of critical importance, the court determined that it was the "intention of the original grantor of the easement to limit the 'nature of enjoyment' of the use of the easement to the grantee's private use for the extremely limited purpose of temporary access if the grantee's primary access was impaired." Therefore, the court concluded that to "expand the use of the easement beyond the intended and actual historical use would constitute a burden upon the servient estate greater than was contemplated at the time the easement was created."

¶22 The court concluded, additionally, that the use of the road must be contained to providing access to the three residences located in the southwest quarter of Section 12, currently owned by Hardy, Arno and Miller. This access, the court emphasized, would be reserved for only those times that "all other access to the dominant estates is not available."

¶23 Hardy, Arno and Miller appeal the findings of fact, the conclusions of law, and a portion of the injunction pertaining to maintenance of the easement at issue.

## STANDARD OF REVIEW

¶24 This Court reviews the findings of a trial court sitting without a jury to determine if the court's findings are clearly erroneous. Rule 52(a), M.R.Civ.P. A district court's findings are clearly erroneous if they are not supported by substantial credible evidence, if the trial court has misapprehended the effect of the evidence, or if a review of the record leaves this Court with the definite and firm conviction that a mistake has been committed. *Engel v. Gampp*, 2000 MT 17, ¶ 31, 298 Mont. 116, ¶ 31, 993 P.2d 701, ¶ 31 (citation omitted). Additionally, in determining whether the trial court's findings are supported by substantial credible evidence, this Court must view the evidence in the light most favorable to the prevailing party. *Engel*, ¶ 31 (citation omitted). We review a district court's conclusions of law to determine whether those conclusions are correct. *Engel*, ¶ 32 (citation omitted).

¶25 Furthermore, the granting of an injunction is discretionary and this Court will sustain such grant unless a manifest abuse of discretion is shown. *Engel*, ¶ 33 (citation omitted); *Knudson v. McDunn* (1995), 271 Mont. 61, 64, 894 P.2d 295, 297 (citation omitted).

## DISCUSSION

¶26 In sum, the law of this case, pursuant to the District Court's order, is confined to the governing set of statutory and common law rules related to determining the scope of an easement. Much of the "relevant" facts and the general direction of the legal arguments set forth by the parties, however, offer little assistance in our discussion of this fundamental concept of property law. It is therefore imperative that we initially set forth what remains at issue in light of the procedural background.

¶27 First, as stated by the District Court at trial, the issue of the easement's location in the northwest quarter of Section 12 is no longer at issue. The permanent injunction resolved this as a matter of law, and has not been appealed. Thus, the "orange road" as it has been identified in the record is, as a matter of law, the easement road to which the Appellants have a non-possessory interest and the scope of which was ultimately determined by the District Court.

¶28 Next, it is important to recognize that the Respondents, Krage and Guthrie, did not prevail in obtaining the remedy they sought--the legal extinguishment of the easement at issue. They have not cross-appealed. Although the Appellants Hardy, Miller and Arno did

not prevail either, they managed to retain their incorporeal interest in the easement granted to Hardy in 1977, contrary to the wishes of the Guthries and Krages. Thus, the District Court, in exercising its equitable powers afforded courts in such matters, chose to craft a compromise solution. *See*, *e.g.*, *Grosfield v. Johnson* (1935), 98 Mont. 412, 423, 39 P.2d 660, 664 (citations omitted). Accordingly, the court merely equitably defined, once and for all, the scope of the easement. *See generally Engel*, ¶ 50 (district court, in recognizing "ongoing animosity between the parties," fashioned remedy that balanced rights regarding ditch easement). In the end, the court curtailed Appellants' use of the alternative access "orange road," to non-primary temporary travel only, in the event their primary right of way becomes impaired for some reason.

¶29 We shall therefore carefully confine our discussion only to the legal questions involving the scope of the easement which have been contested on appeal, and disregard all peripheral matters presented by the parties that are not germane.

## Issue 1.

*Did the District Court determine the scope of Appellants' easement, and that Appellants exceeded the scope and therefore burdened the servient estate, based on substantial credible evidence?*

¶30 With the assistance of new counsel on appeal, Appellants argue that there is no "credible, admissible evidence in the record" to support numerous findings and conclusions of law set forth by the District Court in its order and judgment which defined the scope of the Appellants' easement located on the northwest quarter of Section 12, and in turn determined that the Appellants had exceeded the scope and therefore had burdened the servient estates.

¶31 We disagree.

¶32 We conclude that the District Court's findings supporting its legal conclusions pertaining to the scope of the easement at issue are well-grounded in substantial credible evidence. While the District Court may have improvidently chosen the term "emergency" to describe the precise historic nature of the easement at issue, the Appellants entirely failed to offer any evidence whatsoever demonstrating that the use of the northwest quarter easement road--the "orange road" or any other prior portion--was ever used or was ever intended to be used by the Appellants as a permanent primary means of access to the

southwest quarter of Section 12.

¶33 The undisputed evidence further shows that at the time Hardy acquired his interest in the southwest quarter of Section 12 and the appurtenant easement across Hauge's retained northwest quarter, that the right of way was rustic at best. Passage along the route was seasonal, oftentimes impassable due to high water. A bridge suitable for regular vehicular passage across the Nine Mile Creek has not always existed. Until 1995, Hardy had performed little routine repair and maintenance in preserving the easement road as a viable access route from Pine Meadows Lane to the southwest section. His use was, as the court found, "sporadic." Thus, it was only when Hardy chose to increase his use of and improve the road, and thereby undisputedly alter the nature of his 17 years of use, that this dispute arose.

¶34 Appellants offered little evidence to dissuade the court from finding that their conduct in exercising what necessarily should have been the reasonable use and enjoyment of the easement so as not to burden the Guthries' and Krages' use and enjoyment of their property was anything but reasonable.

¶35 Commencing in 1995, the undisputed facts show that Hardy, in league with his grantees, sought to improve the existing road so that it would provide year-around primary access to, at the very least, the northeast quarter of the southwest quarter of Section 12, along with Arno's parcels in the northwest quarter of the southwest quarter. While this action, in and of itself may not be offensive to the servient rights at stake, the overall tone of their communications with the Guthries can be characterized as cavalierly telling rather than courteously informing, or asking for permission to maintain, improve upon, or expand the easement in question.

¶36 The Appellants threatened the servient owners on numerous occasions with their specific intentions to expand and improve the easement, which would invariably include travel by various construction and logging vehicles. Two home sites were cleared due south of the Guthries' property--which is significant in light of the fact that the co-owners of the northeast quarter, Hardy and Miller, both had residences located elsewhere on the southwest quarter. There is no evidence that use of the easement was required during the construction of any of the current residences located on the southwest quarter, or that any necessary services supplied to these residences have ever required the use of the easement road at any time.

¶37 Further, the Appellants sought to surreptitiously improve a small bridge, which was seasonally impassable, that would have required the use of construction equipment on the easement road. Again, no notice or permission was sought by the Appellants. In asserting their right to use the easement, the Appellants damaged or interfered with property belonging to the Guthries and Krages, including cutting and tearing down fences, removing or damaging signs, damaging trees, and purposely leaving an entry gate open on numerous occasions.

¶38 One of the precipitous events prior to the 1996 injunction involved Hardy and Miller driving a pickup down the Guthrie's private-entry driveway, and proceeding to ride roughshod over the Guthries' lawn, down an overgrown abandoned logging road, tearing down fences and threatening Carol Guthrie along the way. Whereas in Robert Frost's New England good fences make good neighbors, in Montana, generally speaking, messing with your neighbor's fence is a good way to start trouble that comes cheap and leaves expensive. *See*, *e.g.*, *State v. Mumford* (1924), 69 Mont. 424, 222 P. 447 (defendant accuses neighbor of cutting down his fence, which neighbor denies; gun play ensues resulting in neighbor's death and defendant's conviction for manslaughter).

¶39 Finally, Appellants offered little or no evidence beyond pure speculation that their historical and practical primary access from the south, which includes a forest service road, has been or will be impaired, other than an occasional winter mishap involving other vehicles--the very kind of temporary conditions addressed by the District Court's order.

¶40 The court properly found, therefore, that the Appellants' use of the easement road, particularly that of Hardy, changed beginning in 1995 to the detriment of the servient owners, the Krages and Guthries. The findings further clearly reveal that Hardy was particularly incapable of abiding by the court's 1996 injunction, choosing instead to test the resolve of the Guthries, and assert his own interpretation of the court's injunction rather than seek a clarification of his legal rights. That the Guthries and the Krages were burdened by the Appellants' unreasonable and vexatious use of the easement to the extent that some form of an equitable remedy was required to preserve their right of use and enjoyment and maintain the status quo is supported by substantial credible evidence.

¶41 Thus, in light of such evidence, the District Court followed the principle that any line of adjustment between conflicting rights must be drawn on practical grounds. *See Boston Ferrule Co. v. Hills*, 34 N.E. 85, 86-87 (Mass. 1893) (Holmes, J). Here, the circumstances dictated that the court, based on the findings, tailor a precise and restrictive remedy that

would hopefully settle this dispute once and for all. We hold that the findings of the court, upon which it based its legal conclusions, were based on substantial credible evidence.

## *Issue 2.*

*Did the District Court apply the correct law in determining the proper scope of the Appellants' easement?*

¶42 The Appellants contend that the District Court's reliance on, or misinterpretation of, this Court's decision in *Leffingwell Ranch, Inc. v. Cieri* (1996), 276 Mont. 421, 916 P.2d 751, constituted reversible error. Appellants contend that "the District Court's conclusion that *Leffingwell* stands for the proposition that historical use is somehow supposed to restrict the scope and extent of purchased deeded easements like the one at issue in this case, is erroneous."

¶43 The basis of the Appellants' argument is that the 1977 deed granting the easement to Hardy should control because it is clear and not ambiguous. Accordingly, they contend that the court erred when it "obviously went beyond the plain language of the Deed to reach these findings and conclusions . . . ." Curiously, the Appellants then offer multiple examples of extrinsic evidence of what Hardy and his grantor, Hauge, "obviously intended" and what the deed "almost incontrovertibly establishes."

¶44 Despite this inherent inconsistency, Appellants express grave concern that due to the District Court's improper application of case law, the rule of law on this particular issue is at stake, and that this Court risks establishing precedent that would conflict with case law governing easements in Montana. Namely, Appellants contend that there is a clear distinction between deeded easements and those created through implication or by prescription. Only in analyzing the scope and location of the latter, they contend, may a court look to an easement's historical use and its general purpose in light of the circumstances surrounding its use.

¶45 This position, however, ignores the prevailing authority established in our case law that is conveniently absent from the pages of Appellants' brief to this Court, but was obviously followed by the District Court in reaching its conclusions.

¶46 Appellants are correct that, as a general rule, where the creating words of a deed make the scope and the location of an easement perfectly clear, there is no need for further

inquiry. "Where an easement is *specific in nature*, the breadth and scope of the easement are strictly determined by the actual terms of the grant." *Mason v. Garrison*, 2000 MT 78, ¶ 21, 299 Mont. 142, ¶ 21, 998 P.2d 531, ¶ 21 (emphasis added and citations omitted). In other words, if the grant is specific in its terms, it is "decisive of the limits of the easement." *Mason*, ¶ 21. *See also* § 70-17-106, MCA (extent of a servitude is determined by the terms of the grant); *Van Hook v. Jennings*, 1999 MT 198, ¶ 12, 295 Mont. 409, ¶ 12, 983 P.2d 995, ¶ 12 (breadth and scope of an easement are determined upon the actual terms of the grant) (citations omitted).

¶47 This Court has consistently held, however, that where the granting language is *general in nature*, rather than specific, courts must look beyond the plain language of the grant in defining the scope and breadth of the servitude:

> If the easement is not specifically defined, it need only be such as is reasonably necessary and convenient for the purpose for which it was created. It is sometimes held . . . where the grant or reservation of an easement is general in its terms, that an exercise of the right, with the acquiescence and consent of both parties, in a particular course or manner, fixes the right and limits it to that particular course or manner.

*Strahan v. Bush* (1989), 237 Mont. 265, 268, 773 P.2d 718, 720 (citations omitted). *Under such circumstances, the question of what may be considered reasonably necessary and convenient in light of the easement's intended purpose is determined with a view to the situation of the property and the surrounding circumstances. See Mason, ¶ 22; Strahan, 237 Mont. at 268, 773 P.2d at 720; Section 70-17-106, MCA (extent of a servitude is determined by the terms of the grant or the nature of the enjoyment by which it was acquired). See also 25 Am.Jur.2d, Easements and Licenses § 83 at 654 (1996) (stating guiding principle that no definite rule can be stated as to what may be considered a reasonable use of an easement as distinguished from an unreasonable use; rather, the question is usually one of fact to be determined in the light of the situation of the property and the surrounding circumstances).*

¶48 Thus, in stark contrast to Hardy's version of the rule of law, we have consistently held that in the absence of clear specifications defining scope no use may be made of a right-of-way different from the use established at the time of the creation of the easement so as to burden the servient estate to a greater extent than was contemplated at the time the easement was created. *See Leffingwell*, 276 Mont. at 431, 916 P.2d at 757. One formula articulated by the authors of a treatise suggest that as conditions change, so too may the use by the dominant tenement so long as the changes are "evolutionary but not revolutionary." *See* Roger A. Cunningham et al., The Law of Property § 8.9 at 459 (2d ed.

1993).

¶49 The deed at issue here is clearly one of a general nature in terms of scope. It merely provides that it would provide "access to the property agreed to be bought and sold" via a "presently situated road" that was perhaps 14 feet in width. Indeed, we agree with Appellants that the easement *was* unrestricted--rather than restricted by specific particulars regarding scope--and therefore the intended purpose, the use of the easement by its owners, as well as the general surrounding circumstances, must be accounted for where the scope is controverted by the parties. Thus, in applying the appropriate rules, the questions before the District Court boiled down to one: in light of all the surrounding circumstances of the easement at issue, was the Appellants' use of the easement reasonable?

¶50 In view of the foregoing, we conclude that Appellants committed a fundamental error of legal analysis by utterly confusing rules with facts in arguing that the *Leffingwell* decision is inapplicable to this case when they chimed:

> Given the vast factual differences between this case and *Leffingwell*, the District Court erred in determining that Leffingwell was the "guiding case for construction of the road easement at issue . . . ."

The District Court did nothing more than follow several well-founded rules identified by this Court in *Leffingwell* and applied them to its own findings of fact in reaching it conclusions concerning the reasonableness of the Appellants' use of the easement.

¶51 For example, in *Leffingwell* we quoted from this Court's decision in *Strahan v. Bush* that "[i]f the easement is not specifically defined, it need only be such as is reasonably necessary and convenient for the purpose for which it was created." *See Leffingwell*, 276 Mont. at 430, 916 P.2d at 757 (quoting *Strahan*, 237 Mont. at 268, 773 P.2d at 720). The *Leffingwell* Court further quoted from *Strahan* the very rule this Court has cited above, that "where the grant or reservation of an easement is general in its terms, that an exercise of the right, with the acquiescence and consent of both parties, in a particular course or manner, fixes the right and limits it to that particular course or manner." *Leffingwell*, 276 Mont. at 430, 916 P.2d at 757.

¶52 The *Leffingwell* Court then identified the rule found in *Lindley v. Maggert* that "no use may be made of the right of way different from the use established at the time of the

creation of the easement so as to burden the servient estate to a greater extent than was contemplated at the time the easement was created." *Leffingwell*, 276 Mont. at 431, 916 P.2d at 757 (quoting *Lindley v. Maggert* (1982), 198 Mont. 197, 199, 645 P.2d 430, 432).

¶53 The Appellants similarly attempt to discredit the District Court's reliance on *Kelly v. Wallace*, 1998 MT 307, 292 Mont. 129, 972 P.2d 1117. Why the legal issue discussed in that case--whether the court erred in defining the scope and thereby limiting an easement holder's use of an easement--is not germane here is not explained by Appellants in any meaningful sort of way. *See generally Kelly*, ¶¶ 28-38. Although addressing the scope of an easement by prescription, rather than by deed, we nevertheless followed the same general rules that apply in determining the scope of an easement. For example, we relied on *Leffingwell* for the rule that a substantial increase in traffic can constitute an impermissible expansion of easement rights. *See Kelly*, ¶ 33.

¶54 Accordingly, we hold that the District Court correctly applied the case law germane to the legal questions involving the scope of easements at issue, and did not err in reaching any conclusions based on its interpretation of governing case law.

## Issue 3.

*Did the District Court err in limiting Hardy's use of the easement to ingress and egress, and therefore improperly enjoin him from performing maintenance, repair and improvements?*

¶55 The Appellants contend that the February 14, 1996 permanent injunction prohibiting Hardy from performing repairs, maintenance, or improvements to the easement in question is contrary to "all existing law."

¶56 The Guthries and Krages contend that due to Hardy's conduct in seeking to dramatically improve and expand the existing road, and therefore burden their interests, the District Court properly curtailed his use of the easement under principles of equity.

¶57 Our standard of review of this issue is whether the district court abused its discretion. We will not interfere with the district court's ruling unless a manifest abuse of discretion has been shown. *See Knudson v. McDunn* (1995), 271 Mont. 61, 64, 894 P.2d 295, 297 (citation omitted).

¶58 In determining whether the court abused its discretion, we are initially guided by statutory rules to which a court must adhere. For example, under § 27-19-105, MCA, an order granting an injunction must (1) set forth the reasons for its issuance; (2) be specific in its terms; (3) describe in reasonable detail, and not by reference to the complaint or any other document, the act or acts sought to be restrained; and (4) be binding only upon the parties to the action; their officers, agents, employees, and attorneys; and those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

¶59 As for the specific issue of repair and maintenance, the general rule is that the owner of the easement has not only the right but the duty to keep it in repair, and the owner of the servient tenement is under no duty to maintain or repair it in the absence of an agreement. *See Laden v. Atkeson* (1941), 112 Mont. 302, 306, 116 P.2d 881, 883; 25 Am.Jur.2d, *Easements and Licences* § 94 at 666-67 (1996).

¶60 Here, in sum, the District Court concluded that Hardy was incapable of responsibly exercising his non-possessory rights associated with repairing and maintaining the easement burdening the Guthries' and Krages' property, and therefore enjoined him from any activity other than using the easement for temporary secondary access in the event his primary access becomes impaired. As this Court stated in *Laden v. Atkeson*, "the owner of a dominant estate having an easement, has the right to enter upon the servient estate and make repairs necessary for the reasonable and convenient use of the easement, doing no unnecessary injury to the servient estate." *Laden*, 112 Mont. at 306, 116 P.2d at 883.

¶61 Nevertheless, the court's 1996 injunction, and 1999 order and judgment which reaffirmed the injunction, do not spell out which of the named parties to this action now carries the obligation to maintain the road, in particular the portion that crosses the Nine Mile Creek and enters the north-end of Section 12, which is not used by either the Guthries or the Krages as an access route.

For example, it is not clear from the 1999 order and judgment whether Appellants Arno and Miller may maintain--but not "improve" or "expand"--the easement. Alternatively, it is not clear whether the Krages and Guthries must now--in the absence of any agreement between the parties--maintain the entire easement for the benefit of the Appellants' use, however limited their use may be under the court's order. Further, it is not clear which of the foregoing parties has the burden of fronting the costs for repair and maintenance.

¶62 In light of these lingering uncertainties, we conclude that the court's injunction was not "specific in its terms" nor did it "describe in reasonable detail . . .the act or acts sought to be restrained" or specifically which parties would be bound as required under § 27-19-105, MCA. Obviously, the ultimate goal of the court was to equitably resolve this dispute once and for all. The parties here, however, have identified a potential issue for future dispute. Accordingly, we remand for the limited purpose of clarifying the issue of maintenance and repair on the entire easement road.

### Issue 4.

*Did the District Court err when it concluded that the use of the easement by more than three residences would overburden the servient estate?*

¶63 Appellants contend that the District Court erred when it restricted the limited use of the easement to access only the Hardy, Arno, and Miller residences.

¶64 The court provided in its judgment that "[e]xpanding the road easement to provide access to residences beyond those currently occupied by Hardy, Arno, and Miller imposes too great a burden on the servient estate, the Guthrie and Krage properties described herein. The road easement shall not provide access to any residences other than those occupied as of November 22, 1999 by Hardy, Arno, and Miller."

¶65 Appellants contend that if this Court concludes that the deed provided Hardy and his successors "unrestricted access as was obviously contemplated at the time of the 1977 sale" then we must reverse this restriction imposed on the easement. Appellants again frame their argument with the theory that the deed should be "taken as written" and yet "obviously contemplated" increased use.

¶66 Having concluded that the District Court's findings and conclusions were respectively supported by substantial credible evidence and were correct, we need not pursue further discussion of this issue in accordance with the Appellants' conditional argument.

¶67 Accordingly, the matter is affirmed and remanded for further proceedings consistent with this opinion.

/S/ JAMES C. NELSON

We Concur:

/S/ KARLA M. GRAY

/S/ JIM REGNIER

/S/ TERRY N. TRIEWEILER

/S/ W. WILLIAM LEAPHART