No. 04-537

IN THE SUPREME COURT OF THE STATE OF MONTANA

2005 MT 271

RONALD LEICHTFUSS,

        Plaintiff, Counterdefendant and Appellant,

   v.

CYNTHIA DABNEY,

        Defendant, Counterclaimant and Respondent.


APPEAL FROM:    District Court of the Sixth Judicial District,
                       In and for the County of Park, Cause No. DV 2001-113
                       The Honorable Wm. Nels Swandal, Judge presiding.


COUNSEL OF RECORD:

        For Appellant:

                Karl Knuchel, Attorney at Law, Livingston, Montana

        For Respondent:

                Kevin S. Jones, Christian, Samson, Jones & Chisholm, PLLC, Missoula, Montana


                        Submitted on Briefs:  May 31, 2005

                               Decided:  November 1, 2005


Filed:

                _____
                          Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1    Ronald Leichtfuss (hereinafter, "Leichtfuss") appeals the judgment of the District Court for the Sixth Judicial District, Park County, which found that Respondent Cynthia Dabney (hereinafter, "Dabney") has a prescriptive easement over and across real property owned by Leichtfuss.  We affirm.

¶2    Leichtfuss raises two issues on appeal:

¶3    1.  Did the District Court err in determining that the creation of Dabney's parcel of real property and the subsequent sale and recording of a deed to Dabney did not constitute an increased burden on the prescriptive easements owned by Dabney's predecessors in interest?

¶4    2.  Did the District Court err in determining that Dabney could have availed herself of § 70-30-107, MCA (private eminent domain), as a fallback position in the event no prescriptive easement was available for her?

¶5    Because we affirm the judgment of the District Court on Issue 1, we do not address Issue 2.

## FACTUAL AND PROCEDURAL BACKGROUND

¶6    This dispute involves parcels of land and easements appurtenant located in Section 30 of Township 5 South, Range 9 East, P.M.M., Park County.[1]  *See* Appendix A for a

---

[1]  An easement *appurtenant* is "one whose benefits serve a parcel of land.  More exactly, it serves the owner of that land in a way that cannot be separated from his rights in the land.  It in fact becomes a right in that land and . . . passes with the title."  Roger A. Cunningham et al., The Law of Property § 8.2, at 441 (2d ed. 1993).  The benefitted parcel is referred to as the "dominant

2

depiction of these tracts. Leichtfuss owns two parcels--the E 1/2 of the NW 1/4 (hereinafter, "Parcel 1") and the N 1/2 of the SE 1/4 (hereinafter, "Parcel 2")--which are non-adjoining: the southeast corner of Parcel 1 meets the northwest corner of Parcel 2 at a "dead corner." To the immediate south of Parcel 1 and west of Parcel 2 lie four parcels, one owned by Dabney and the other three by Martin and Gayleen Malone, Dabney's predecessors in interest. The Malones' parcels (hereinafter, the "Malone Property") are contained within and encompass the entirety of the SW 1/4 of Section 30, less ten acres owned by Dabney in the E 1/2 of the SW 1/4.[2] (The Malones' parcels are labeled on Appendix A as "E 1/2 SW 1/4," "Lot 3," and "Lot 4." Dabney's parcel is labeled on Appendix A as "The Briggs Tract.") Dabney's parcel is bounded on its west, south, and east sides by the Malone Property, and on its north side by Leichtfuss' Parcel 1; thus, the northeast corner of the Malone Property shares the dead corner with Leichtfuss' parcels. The real property located to the northeast of the dead corner is owned by Montana Land Resources, Ltd. Co., which is not a party to this action.

¶7      From approximately 1930 to 1980, the SW 1/4 of Section 30 was owned by Leo and Ethel Briggs. The Briggs maintained a homestead (house, barn, and other outbuildings) near

tenement," and the burdened parcel is the "servient tenement." By contrast, an easement *in gross* benefits the holder of the easement "only personally, not in connection with his ownership or use of any specific parcel of land." Cunningham, § 8.2, at 441. With an easement in gross, there is no dominant parcel; thus, "the easement right cannot pass with the title to any land." Cunningham, § 8.2, at 441-42.

        [2] Leichtfuss and the Malones own additional parcels in Section 30; however, those properties are not relevant to this case.

the northern boundary of the E 1/2 of the SW 1/4 and used the rest of the land for farming/agricultural purposes. In 1980, they sold the property (*i.e.*, the entire SW 1/4) to the Malones on a contract for deed in which the Briggs retained a life estate in the N 1/2 of the N 1/2 of the SW 1/4, which encompassed their homestead and forty surrounding acres (hereinafter, the "Briggs Life Estate"). The Malones immediately constructed a residence in "Lot 4" (the SW 1/4 of the SW 1/4). Thus, beginning in 1980, the SW 1/4 of Section 30 comprised two separately owned properties--the Malone Property and the Briggs Life Estate--and two separate residences.

¶8 The Briggs passed away in the mid-1990s,[3] at which time their life estate reverted to the Malones. Two to four years later, in 1999, the Malones commissioned a retracement survey and boundary adjustment of the former life estate and then sold the reconfigured tract to Dabney in fee simple. This ten-acre parcel--labeled "The Briggs Tract" on Certificate of Survey No. 1553, Park County, Montana, although the Briggs no longer lived there--includes the Briggs' old house, outbuildings, and surrounding acreage. The Malones and Dabney have continued to use their properties for residential and farming/agricultural purposes.

¶9 At issue in this case is a small portion of the road used by Dabney and the Malones for ingress and egress to their respective properties. Historically, the SW 1/4 of Section 30 was accessible at two points of entry. Both entry routes departed from a north-south easement known as "Rigler Road," which ran the length of the western edge of the NE 1/4

---

[3] It appears from the record that the life estate ended in 1995, 1996, or 1997.

4

of Section 30 (the parcel now owned by Montana Land Resources) and intersected a county road to the north. (This easement is represented by a dashed line labeled "Rigler Road" on Appendix A.)

¶10     The first access route--termed the "Cut Across Road"--took off from Rigler Road in a southwesterly direction, traversed the southeastern quarter of Leichtfuss' Parcel 1, and terminated at the Briggs' house. (This route is labeled "A" on Appendix A.) In December 1993, the Malones granted Leichtfuss a Release of Easement by which they relinquished any claim to the Cut Across Road effective upon the termination of the Briggs Life Estate. This release, negotiated with Mr. Tavner Walker (Leichtfuss' predecessor in interest) was a condition to Leichtfuss' purchasing Parcel 1 and Parcel 2. Accordingly, the Cut Across Road has not been in use since the mid-1990s.

¶11     The other access route--the "Dead Corner Road"--was a dirt road that extended from the terminus of Rigler Road (at the SW corner of the NE 1/4 of Section 30), across the dead corner, and onto the northeast portion of the SW 1/4. As it traversed the dead corner, the road encroached on both of the parcels now owned by Leichtfuss, though it favored the northwest parcel. (This route is labeled "B" on Appendix A.)

¶12     Prior to 1980, it appears that the Cut Across Road was the favored route for reaching the Briggs' residence, while the Dead Corner Road was used primarily to reach their barn. However, several witnesses testified that the Dead Corner Road was used to access the residence as well. In 1980, following the sale of the SW 1/4 to the Malones, the terminus of the Dead Corner Road was relocated to the south, and the road was improved for regular

5

ingress and egress to the Malones' new residence. In addition, a stretch of the original road running west to the Briggs' barn and home was left intact so that the Briggs could continue to use it to access their property. Several witnesses testified that the Briggs and their guests in fact used this route on occasion to access the homestead after 1980. In other words, from 1980 to the mid-1990s, the Dead Corner Road was used, to some degree, as a route of access to the Malones' residence and the Briggs' home and barn.

¶13    Presently, the Dead Corner Road proceeds south and then southwest from the dead corner to the Malone ranch. In 1999, Dabney improved the westerly stretch of the original road, which now serves as her driveway and, because the Malones abandoned the Cut Across Road, as the exclusive route for ingress and egress to her parcel.

¶14    In October 2001, Leichtfuss filed the instant action seeking to quiet title to the dead corner and to permanently enjoin Dabney and the Malones from using the Dead Corner Road where it crosses his property. Leichtfuss eventually conceded the existence of a prescriptive easement across the dead corner in favor of the Malones; however, he maintained that the Malones had no right to grant Dabney the right to use the easement, that Dabney had no right in herself to use the easement, and that Dabney's use of the Dead Corner Road to access her property exceeds the scope of the Malones' easement, which he claimed is to access one residence (the Malones' ranch house) on one piece of property (the Malone Property). He further contended that the release signed by the Malones not only extinguished their interest in the Cut Across Road, but also "contemplated no further expansion" of the Dead Corner Road.

6

¶15    Dabney filed a counterclaim, seeking a judicial declaration that the existing roadway--in particular, the portion that crosses Leichtfuss' parcels--provides legal access to her property, and that she therefore has an easement over Leichtfuss' parcels for the benefit of the Briggs Tract.  In her amended counterclaim, she advanced an alternative theory pursuant to the eminent domain statutes (§§ 70-30-101 to -323, MCA).

¶16    Following a hearing on April 20, 2004, the District Court issued a decision in favor of Dabney.  The court found that the Briggs had used both the Cut Across Road and the Dead Corner Road for ingress and egress to their single tract from the 1930s to 1980, and that they had continued to use both of these routes to access their life estate from 1980 to the mid-1990s when they died.  In addition, the court found that the Briggs' use of the Dead Corner Road was open, notorious, exclusive, hostile, continuous, and uninterrupted from no later than 1973 (when Mr. Walker purchased the two parcels now owned by Leichtfuss) to the mid-1990s.  The court therefore concluded that by 1978, the Briggs had established a prescriptive easement over Parcel 1 and Parcel 2 at the dead corner for residential, farming, and agricultural purposes on the SW 1/4, including access to the Briggs' house and barn. The court further concluded that by 1985, the scope of the prescriptive easement had been expanded to include ingress and egress to two residences:  the Briggs' homestead and the newly-constructed Malone ranch headquarters.

¶17    With respect to the formation of the Briggs Tract in 1999, the court found that this event "did not act to extinguish the easement established by the Briggs to the house and barn now owned by Dabney" and that "the use of the road by Dabney does not change the

7

character or the use of the easement or expand its use in any manner." Accordingly, the court held that Dabney's property continues to benefit from the prescriptive easement established by the Briggs no later than 1978 and expanded by the Briggs and the Malones by 1985. Lastly, the court clarified that the prescriptive easement in favor of Dabney's property is "limited to a single residential and agricultural use."

¶18 In an alternative holding based on private eminent domain, the District Court observed that "[a]mong the public uses on behalf of which the right of eminent domain may be exercised is private roads leading from highways to farms or residences." Here, "necessity exists to provide access to Dabney's residence and land"; "[a]ccess off of Pray Road, an existing county road, to Defendant Dabney's property requires access over [Leichtfuss'] properties at the dead corner"; and any damages to Leichtfuss resulting from a private condemnation are "non-existent or nominal," since the road already exists, its future use would not be expanded beyond its historical use, and the area of Leichtfuss' properties affected by the road is very small. Accordingly, the court held that even if the creation of the Briggs Tract "did somehow result in an expansion of the historic prescriptive easement over [Leichtfuss'] properties at the dead corner, Defendant Dabney would have an appropriate private eminent domain claim over [Leichtfuss'] properties at the dead corner . . . ."

¶19 Leichtfuss appeals the foregoing findings of fact and conclusions of law.

**STANDARD OF REVIEW**

¶20 We will affirm the factual findings of a trial court sitting without a jury unless those

8

findings are "clearly erroneous." Rule 52(a), M.R.Civ.P.; *Interstate Production Credit v. DeSaye* (1991), 250 Mont. 320, 322, 820 P.2d 1285, 1287. In *Interstate Production Credit*, we adopted a three-part test for determining whether a finding is clearly erroneous:

> First, the Court will review the record to see if the findings are supported by substantial evidence. Second, if the findings are supported by substantial evidence we will determine if the trial court has misapprehended the effect of evidence. Third, if substantial evidence exists and the effect of the evidence has not been misapprehended the Court may still find that a finding is "clearly erroneous" when, although there is evidence to support it, a review of the record leaves the court with the definite and firm conviction that a mistake has been committed.

*Interstate Production Credit*, 250 Mont. at 323, 820 P.2d at 1287 (internal citations and quotation marks omitted).

¶21 With respect to the District Court's conclusions of law, our standard of review is plenary, and we must determine whether the court's interpretation of the law is correct. *Steer, Inc. v. Department of Revenue* (1990), 245 Mont. 470, 474-75, 803 P.2d 601, 603; *Blackwell v. Lurie* (1997), 284 Mont. 351, 355, 943 P.2d 1318, 1321.

## DISCUSSION

¶22 *1. Did the District Court err in determining that the creation of the Briggs Tract and the subsequent sale and recording of a deed to Dabney did not constitute an increased burden on the prescriptive easements owned by the Malones?*

¶23   A.   *The District Court correctly concluded that Dabney has an easement over the dead corner by virtue of her predecessors' prescriptive use and the Malones' transfer of the prescriptive easement when she purchased the Briggs Tract.*

¶24   Dabney maintains that she "and her predecessors in interest established a prescriptive easement over Leichtfuss' property for the benefit of both the Malone property and what is now Dabney's property." The burden at trial on a party seeking to establish an easement by prescription is to show, by clear and convincing evidence, each of the following elements: open, notorious, exclusive, adverse, continuous, and uninterrupted use of the claimed easement for the full statutory period of five years. *See Wareing v. Schreckendgust* (1996), 280 Mont. 196, 204, 206, 930 P.2d 37, 42, 43; *Bonnie M. Combs-DeMaio Liv. Trust v. Colony*, 2005 MT 71, ¶ 14, 326 Mont. 334, ¶ 14, 109 P.3d 252, ¶ 14; § 70-19-401, MCA. Because only two years had elapsed between her purchasing the Briggs Tract in 1999 and Leichtfuss' filing the instant action in 2001, Dabney could not have established a prescriptive easement over the dead corner on her own. However, she could have gained such an easement either (1) because it already existed when she purchased the Briggs Tract and was conveyed to her by the Malones at that time or (2) through the doctrine of "tacking," pursuant to which she could have added her use of the Dead Corner Road from 1999 to 2001 to her predecessors' use of the road from 1996 to 1999 (for a total of five years).[4]

---

[4]   The doctrine of tacking involves "[t]he joining of consecutive periods of possession by different persons to treat the periods as one continuous period; esp., the adding of one's own period of land possession to that of a prior possessor to establish continuous adverse possession for the statutory period." Black's Law Dictionary 1465 (7th ed. 1999). It is long established in this State that "tacking of prescriptive periods is permissible when there is a privity between the successive users of the easement." *Groshean v. Dillmont Realty Co.* (1932), 92 Mont. 227, 241, 12 P.2d 273, 276.

10

¶25     The District Court ordered briefing from the parties on the issue of tacking.  In his supplemental brief, Leichtfuss asserted that " 'tacking' attaches to the legal description of the dominant tenement.  It would be impossible to 'tack' to a legal description prior to its existence," a reference to the fact that the Briggs Tract did not exist until the retracement survey in 1999.

¶26     Dabney, for her part, argued that "[t]he 'tacking' of Dabney's ownership interest in the property to her predecessors in interest is not necessary for the establishment of her prescriptive easement claim in this case," because

> [l]ong before Defendant Dabney owned the property, Briggs' and Malones' use of the road over what is now [Leichtfuss'] property clearly established a prescriptive easement for the benefit of both home sites.  An extinguishment of that prescriptive easement requires the exact same elements for the statutory five year period as establishing a prescriptive easement. [Citation.] [¶] The short time between Briggs' occupation of the property, its reversion to Malones after termination of the Briggs' life estate, and Malones' sale to Defendant Dabney would not be sufficient time for [Leichtfuss] to have extinguished the prescriptive easement long since established by Briggs, Malones, and their guests and invitees.

In conformity with the foregoing argument, Dabney presented no information or affidavits concerning the Malones' use of the stretch of road that is now Dabney's driveway during the two- to four-year period beginning with the Briggs' deaths in 1995, 1996, or 1997 and ending with the sale of the Briggs Tract to Dabney in 1999.

¶27     Not surprisingly, therefore, the District Court entered no findings on the issue of tacking.  Rather, having been persuaded by Dabney's argument, the court adopted the first position outlined above:  that Dabney gained the prescriptive easement because it already

11

existed when she purchased the Briggs Tract and was conveyed to her by the Malones at that time. Specifically, the court concluded as follows: (1) by 1978, the Briggs had established a prescriptive easement over Leichtfuss' parcels at the dead corner "for residential, farming and agricultural purposes, including access to Briggs' home and barn"; (2) the continued and concurrent use of the Dead Corner Road by the Briggs and the Malones beginning in 1980 expanded the scope of the original easement which, by 1985, "include[d] not only the two properties originally owned by Briggs and sold to Malones[5] and the original Briggs' home site and barn, but also the newly-constructed Malone residence"; and (3) Dabney's property "continues to benefit from the prescriptive easement first established in the 1930's and, at the very latest, by 1978," and "expanded [in scope] by 1985, following five years of open, notorious and hostile use by both Malones and Briggs."

¶28    The District Court did not cite authority in its Findings of Fact and Conclusions of Law for conclusion #3 above. Granted, the court observed that "[a] prescriptive easement, once established, is not divested by subsequent transfer of the *servient* estate. *Lemont Land* [*Corp.*] *v. Rogers*, [*sic*] (1994), 269 Mont. 180, [183,] 887 P.2d 724[, 726]." (Emphasis added.) However, the transfer to Dabney was of a portion of the *dominant* estate.

¶29    Still, "[a] transfer of real property passes all easements attached to it. Section

_____

    5 "[T]he two properties originally owned by Briggs and sold to Malones" appears to be a reference to the SW 1/4 of Section 30 (now comprising the Malone Property and the Briggs Tract) and the S 1/2 of the SE 1/4 of Section 30 (labeled "C-S 1/16" on Appendix A). As mentioned above (*see* footnote 2, *supra*), this latter parcel is not relevant to the issues discussed herein.

12

70-20-308, MCA. Thus, the valid conveyance of real property conveys all easements that attach to the property." *Burleson v. Kinsey-Cartwright*, 2000 MT 278, ¶ 16, 302 Mont. 141, ¶ 16, 13 P.3d 384, ¶ 16. The District Court referred to this rule in its Order granting the Malones' motion for summary judgment and denying Dabney's motion for summary judgment:

> It is well-established law that a transfer of real property passes all easements . . . attached thereto and creates in favor thereof an easement to use other real property of the person whose estate is transferred in the same manner and to the same extent. [*Albert G.*] *Hoyem Trust v. Galt*, 1998 MT 300, [¶ 30,] 292 Mont. 56, [¶ 30,] 968 P.2d 1135, [¶ 30 (quoting § 70-20-308, MCA)].

Accordingly, we hold that the District Court's conclusion that Dabney gained a prescriptive easement over the dead corner because the easement already existed when she purchased the Briggs Tract and was conveyed to her by the Malones at that time was a correct application of Montana law governing the transfer of easements appurtenant.

¶30 This does not end the inquiry, however. Section 70-17-107, MCA, provides that "[i]n case of partition of the dominant tenement, the burden must be apportioned according to the division of the dominant tenement *but not in such a way as to increase the burden upon the servient tenement*." (Emphasis added.) Furthermore, the scope of an easement gained by prescription is constrained by--*i.e.*, may not exceed--the character and extent of the use made of it during the prescriptive period. *See Warnack v. Coneen Family Trust* (1994), 266 Mont. 203, 217-18, 879 P.2d 715, 724; *Kelly v. Wallace*, 1998 MT 307, ¶ 31, 292 Mont. 129, ¶ 31, 972 P.2d 1117, ¶ 31, and cases cited therein; § 70-17-106, MCA. *See also* Restatement (Third) of Property, Servitudes (hereinafter, "Rest. 3d") § 4.10 illus. 15, at 599-600 (2000).

¶31     Concerning the scope of the dead corner easement and the burden on the servient tenement, the District Court concluded that "[t]he boundary relocation and survey [which resulted in the creation of the Briggs Tract in 1999] did not expand the scope of the prescriptive easement over [Leichtfuss'] properties and did not increase the burden of the prescriptive easement over [Leichtfuss'] properties, the servient estates." The court also held that "the use of the [Dead Corner Road] by Dabney does not change the character or the use of the easement or expand its use in any manner."

¶32     Leichtfuss asserts that these conclusions are "clearly erroneous under the facts and the law." He contends that the burden upon his parcels has in fact increased because (1) Dabney's ongoing use of the Dead Corner Road for ingress and egress to the Briggs Tract is beyond the easement's scope as established during the prescriptive periods, and (2) the creation of the Briggs Tract constitutes, in and of itself, an increased burden on the servient tenement. As support for these theories, he points to an "increase in the number of properties sought to be served" by the easement and an "increase in traffic" over the dead corner. For the reasons which follow, however, we hold that the District Court correctly concluded that Leichtfuss' parcels are not being impermissibly burdened.

¶33     B.      *The scope of the Dead Corner Road easement already encompassed ingress and egress to two tracts of land when the Briggs Tract was created in 1999.*

¶34     Whether the burden upon a servient tenement has increased as the result of a partition of the dominant tenement depends in part on the easement's pre-partition scope, which "is determined by . . . the nature of the enjoyment by which it was acquired." Section 70-17-

14

106, MCA. As explained above, the Briggs established the prescriptive easement over the dead corner for residential and farming purposes on the SW 1/4 of Section 30 no later than 1978, and the easement passed by operation of § 70-20-308, MCA, to the Malones in 1980 when they purchased the property from the Briggs in fee simple. Yet, the scope of the easement did not change as a result of this sale. *See Gibbens v. Weisshaupt* (Idaho 1977) 570 P.2d 870, 876 ("[T]he extent and scope of a prescriptive easement cannot be enlarged unless the increased use has occurred for the entire statutory period required by law."). Rather, by virtue of the Briggs' retaining a life estate and continuing to use the easement, a new prescriptive period began in 1980 and the scope of the easement was effectively expanded by 1985 to benefit two dominant tenements: the Malones' fee simple estate and the Briggs' life estate. However, because a life estate is a real property interest of limited duration, *see* 2 Thompson on Real Property, Thomas Edition § 19.02, at 511 (David A. Thomas ed., 1994), the critical question is whether this expanded scope survived the termination of the Briggs' life estate in the mid-1990s. If it did, then Dabney's present use of the Dead Corner Road is within the scope of the easement as established during the relevant prescriptive period, and the burden on Leichtfuss' parcels has not increased.

¶35     Leichtfuss asserts that "until the Dabney tract was created, the road which became the easement for Malones by virtue of a prescriptive use . . . served one (1) tract of land." He explains that "[d]uring the time period that Malones owned their property, they established an easement by prescription over the 'dead corner'. *The road serviced just their parcel of*

15

*property. The Briggs gave up their life estate some time in 1996.*"[6]  (Emphasis added.)

Thus, in his view, the easement's scope reverted upon the Briggs' deaths in 1996 to the use established during the original pre-1980 prescriptive period. Restated, the Dead Corner Road benefitted two separately-owned property interests until 1996 only; at that time, the benefit to the Briggs Life Estate terminated, leaving only a single parcel benefit for the SW 1/4 of Section 30 (the original dominant tenement), then owned in its entirety by the Malones in

---

[6] Leichtfuss' statement that "[t]he road serviced just [the Malones'] parcel of property," when read in context, is a characterization of the portion of the dead corner easement that benefitted the Malone Property, as distinguished from the portion that benefitted the Briggs Life Estate. In other words, his argument here is not that as of 1980, the Dead Corner Road served *just* the Malone Property (and not the Briggs Life Estate). Such an argument necessarily would imply that the Cut Across Road became the exclusive route for ingress and egress to the Briggs Life Estate. Yet, Mr. Malone, Mrs. Malone, David Rigler (a former owner of the parcel now owned by Montana Land Resources), and Harold Marchington (a cousin of Ethel Briggs) all testified that the Briggs, and sometimes their guests, used the Dead Corner Road to access their house and/or barn both before and after 1980. Thus, the District Court's conclusion that "[b]y 1985, the scope of the prescriptive easement had been expanded to include . . . the original Briggs' home site and barn, [and] the newly-constructed Malone residence" is supported by substantial evidence in the record, and any assertion to the contrary would lack merit.

fee simple.[7]  For this reason, Leichtfuss maintains, Dabney's use of the Dead Corner Road

is beyond the easement's scope.

¶36    Dabney counters that

> Malones and Briggs used the prescriptive easement over the Leichtfuss
> property to access two pieces of property before the boundary relocation.
> Malones, and now Malones and Dabney, are using the same prescriptive
> easement to access the same two properties, albeit with different legal
> descriptions, following the boundary relocation. [¶] . . . The roadway
> historically was used, and has continued to be used, to access two separate
> properties and two separate residences.

---

[7]  This was not Leichtfuss' original theory.  At the April 20, 2004, hearing, his counsel posed the following question to Mr. Malone:  "[W]hen you and your family purchased this property in 1980, that was one ownership, wasn't it, your family?"  And he later asked Mrs. Malone, "from 1980 until 1999, Lot 3, Lot 4, the Briggs Tract, and the Malone Tract were all what you and Marty owned."  The implication of these questions is that the Malones owned the entirety of the SW 1/4 of Section 30 outright and simply "allowed the Briggs' [sic] to reside in their homestead."  Yet, the record establishes that the Briggs were not mere guests of the Malones for fifteen years, but instead held a separate property interest in their homestead.  For this reason, Leichtfuss has not advanced this theory on appeal.

Similarly, because Leichtfuss is claiming that the benefit afforded the Briggs' life estate by the easement terminated *as a matter of law* upon their deaths in 1996, his position is not a continuation of his argument in the District Court that *the release* signed by the Malones in 1993 terminated all easements serving the Briggs' house, barn, and surrounding acreage upon the extinguishment of their life estate.  Indeed, he now acknowledges that after he bought his parcels in 1993, the Malones "continued to use [the Dead Corner Road] as the driveway to their home" and "[t]his driveway also serviced the Briggs Tract, as the western-most driveway [the Cut Across Road] had become obliterated" (as a result of the release).  Moreover, he has not challenged the District Court's finding that "it was not the intent of either party that the access at the dead corner be affected in any manner [by the release]," which, in any event, is supported by substantial evidence in the record.  For instance, the terms of the release reference only the Cut Across Road, and the record reflects that neither Leichtfuss' predecessor in interest (Mr. Walker) nor the Malones had the Dead Corner Road in mind during their negotiations.  Accordingly, Leichtfuss now characterizes the release as "cover[ing] the westerly driveway into the Briggs Tract area [*i.e.*, the Cut Across Road]" only.

17

This analysis is similar to Dabney's argument in the District Court that "[l]ong before Defendant Dabney owned the property, Briggs' and Malones' use of the road over what is now [Leichtfuss'] property clearly established a prescriptive easement for the benefit of both home sites. *An extinguishment of that prescriptive easement requires the exact same elements for the statutory five year period as establishing a prescriptive easement.*" (Emphasis added.) Thus, in Dabney's view, the easement established for the benefit of the Briggs' homestead endured beyond the Briggs' life estate.

¶37 The precise issue, therefore, is whether an easement established by prescription for the benefit of a dominant tenement held as a life estate terminates as a matter of law upon the extinguishment of that life estate.[8] As a general rule, an easement appurtenant attaches

---

[8] It is fair to say that the briefing in this case--and on this issue in particular--is not particularly artful. Indeed, the same could fairly be said about some aspects of the case while it wended its way through the District Court. Be that as it may, our job is to address the issues presented by the parties on appeal.

Here, Leichtfuss asserts as one of his "increased burden" arguments that the District Court "erred by determining Dabney's use of the prescriptive easement[] . . . did not constitute an increased burden to the servient tenement held by Leichtfuss." As explained above, in order to reach a conclusion on this question, it is necessary first to determine the scope of the easement transferred to Dabney by the Malones when she purchased the Briggs Tract. This, in turn, requires an examination of the Malones' and the Briggs' use of the easement between 1980 and 1985 *and a determination as to whether the scope established during that period passed to Dabney*.

Integral to this latter determination is the issue of whether the extinguishment of the Briggs' life estate caused the easement to revert to the single parcel use established before 1980. In other words, did the expanded scope of the Dead Corner Road continue after their life estate ended, or not? The parties' arguments on this question are, at best, underdeveloped. As a general rule, "we will not consider unsupported issues or arguments," since "this Court is under no obligation to locate authorities or formulate arguments for a party in support of positions taken on appeal." *In re Marriage of McMahon*, 2002 MT 198, ¶ 6, 311 Mont. 175, ¶ 6, 53 P.3d 1266, ¶ 6. On the other hand, this case presents an unusual situation in that we cannot answer the

18

to, passes with, and is an incident of ownership of the particular land to which it is appurtenant. *See* 7 Thompson, *supra*, § 60.07(b)(1), at 470. In other words, such an easement "runs with land," which means that the benefit or burden passes automatically to successors. *See* Rest. 3d § 1.5 cmt. a, at 31. Yet, a number of courts have held that an easement burdening or benefitting *an estate less than a fee simple* ends when that estate expires. *See* Jon W. Bruce & James W. Ely, Jr., The Law of Easements and Licenses in Land, § 10:15, at 10-28 (2001), and cases cited therein. As such, it may be more precise to

_____

ultimate question of whether Dabney's use of the easement constitutes an increased burden on Leichtfuss' servient parcels, as he claims, without first addressing the issue of whether an existing prescriptive easement can be permanently expanded in scope by a second prescriptive use benefitting an estate of limited duration.

In this regard, we observe that "a court may consider an issue 'antecedent to . . . and ultimately dispositive of' the dispute before it, even an issue the parties fail to identify and brief." *United States Nat. Bank of Ore. v. Independent Ins. Agents of America, Inc.* (1993), 508 U.S. 439, 447, 113 S.Ct. 2173, 2178, 124 L.Ed.2d 402. Similarly, "[w]hen an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." *United States Nat. Bank of Ore.*, 508 U.S. at 446, 113 S.Ct. at 2178 (internal quotation marks omitted) (alteration in original). Indeed, as we have previously recognized, " ' * * * If the court were limited to the arguments and reasoning of counsel in its decisions of cases, to the exclusion of its own observations, many cases would lead us far from what we understand to be the true object of the court.' " *Kudrna v. Comet Corp.* (1977), 175 Mont. 29, 51, 572 P.2d 183, 195. Moreover, if the boundaries of our opinions were circumscribed by the inadequacies of the briefs submitted on appeal, then in many cases we would be issuing opinions that set bad precedent and confuse, rather than clarify, the law.

Resolution of the particular "increased burden" theory presently under consideration is not "ultimately dispositive of" the *entire* dispute, since we must also consider Leichtfuss' other "increased burden" theory, *see* Part 1.C., *infra*; however, the entire dispute cannot be resolved without consideration of both theories and the issues integral thereto. Accordingly, while we use this approach sparingly, we determine in this case that even though the parties did not present the issue related to the termination of the Briggs' life estate artfully or develop the corresponding argument fully, it is appropriate for us to address the issue since it is an integral step in our analysis.

19

say that an easement runs with the *estate* in land to which it is appurtenant, or that it follows ownership of the estate *for as long as that estate exists*.

¶38    The foundation for this principle is easily understood where the *servient* tenement is held in less than fee simple:  a person can convey no more or greater title than he holds.  *See* Rest. 3d § 4.3 cmt. e, at 526 ("The duration of a servitude is normally limited to the duration of the estate of the creator of the servitude because the creator cannot *burden* a greater estate than he or she has.") (emphasis added).  In other words, a life tenant or a lessee generally cannot impose upon his land a burden that passes to the remainderman or the reversioner.[9]

¶39    Where the *dominant* tenement is held in less than fee simple, however, the basis for the foregoing rule--which prevents the *benefit* of an easement from running to the remainderman or reversioner--is less obvious.  A number of courts have ruled that an easement granted to a life tenant or lessee terminates as a matter of course with the life estate

---

[9]  *See, e.g.*, *Newhoff v. Mayo* (N.J. 1891), 23 A. 265, 267 (The lessee of the servient tenement granted to the lessee of the dominant tenement "a right of passage or way . . . which had all the qualities of an easement; but it was imposed upon an estate for years in favor of a like estate, and would terminate whenever the dominant or servient estate ceased to exist in persons entitled to or affected by creation of the right."); *Williams v. Southern Bell Tel. & Tel. Co.* (N.C.App. 1980), 266 S.E.2d 700, 702 ("As a life tenant, [the grantor] could not create an estate or interest [in the servient tenement] to endure beyond the term of her own estate."); *Gowan v. Crawford* (Ala. 1992), 599 So.2d 619, 623 ("[Grantor] was only a life tenant on the property and any contract she made concerning the land was enforceable only during her life."); *Martin v. Sun Pipe Line Co.* (Pa. 1995), 666 A.2d 637, 639 ("[Life tenant] could only grant the easement for the duration of his life estate."); 7 Thompson, *supra*, § 60.03(a)(4), at 412 ("[A]nyone who is the possessor of [] land may burden it with an easement; [however,] that easement cannot last any longer than the possessor's possessory estate in the land."). *But see* Rest. 3d § 4.3 cmt. e, at 527 ("Prescription can operate against the holder of a future interest[, but] only if the use is open or notorious as to that person and only if the holder of the future interest has the right to sue to terminate the use as to the future interest.").

20

or lease.[10] Yet, there is nothing inherent in a future estate that would preclude its benefitting from a servitude. To the contrary, a servitude may be created to burden or benefit *any* estate in land, including present possessory estates and future estates. *See* Rest. 3d § 2.5 & cmt. a, at 99. In a factual scenario analogous to the case at hand, the Restatement posits the following illustration:

> O, the owner of a fee simple in Blackacre, granted an easement to A, the owner of a 10-year lease term in Whiteacre, to use the driveway across Blackacre for access to Whiteacre. The deed states that the easement is intended to benefit the term and the reversion in Whiteacre. The servitude burdens the fee-simple estate in Blackacre and benefits both the leasehold estate *and the reversion* in Whiteacre.

Rest. 3d § 2.5 illus. 3, at 100 (emphasis added). As this illustration demonstrates, the termination of a dominant estate held in less than fee simple does not *automatically* extinguish an easement appurtenant thereto. Rather, it is the intent or expectations of the parties to the servitude which determine the duration thereof.

¶40 Indeed, a careful reading of the opinions of each of the aforementioned courts which held that an easement granted to a life tenant or a lessee terminates with the life estate or lease reveals that the results in those cases were grounded, to some extent, on a presumption

---

[10] *See, e.g., Hoffman v. Savage* (Mass. 1818), 15 Mass. 130, 131 (right of way appurtenant to the dominant estate of a dowager expired with that estate); *Leuthold v. John A. Stees Co.* (Minn. 1918), 169 N.W. 709, 710-11 ("An estate for years may be a dominant estate or a servient estate; but there cannot be created in favor of an estate for years an easement extending beyond its life and binding the reversion or the servient estate."); *I.R.T. Property Co. v. Sheehan* (Fla.App. 2 Dist. 1991), 581 So.2d 591, 592 (easement granted to lessee in lease agreement expired with lease); Bruce & Ely, *supra*, § 2:9, at 2-20 to 2-21 ("An easement . . . made appurtenant to a dominant estate that is less than a fee simple . . . exists only for the period of the dominant owner's interest; it may not be enjoyed by the reversioner.").

that the grantor of the easement was aware of the terminable nature of the grantee's estate and intended the easement to exist only for that limited duration, or that the life tenant or lessee did not intend to permanently burden the servient estate. The Third Restatement has succinctly described this approach in the following terms: "A servitude should be interpreted to give effect to the intention of the parties ascertained from the language used in the instrument, *or the circumstances surrounding creation of the servitude*, and to carry out the purpose for which it was created." Rest. 3d § 4.1(1), at 496-97 (emphasis added).

¶41    Having considered the foregoing authorities in the context of the facts of the case at hand, we conclude that rigid application of a rule that prevents the *benefit* of an easement from running to a remainderman or reversioner is unsound. To hold that the Dead Corner Road easement's scope reverted to a single parcel use based solely on the fact that the Briggs' property interest beginning in 1980 was held as a life estate would attach undue significance to the legal classification of their estate at the expense of the expectations of the Briggs, the Malones, and Mr. Walker (who owned the servient parcels during the second prescriptive period of 1980 to 1985). Moreover, it would impair the utility of the easement, which had been effectively expanded to serve both residences, without any support in the record for limiting the easement's utility. *See* Rest. 3d § 5.2 cmt. a, at 16 ("Because servitudes are used to create relatively permanent arrangements with respect to property by tying rights and obligations to the property, their utility would be impaired if the burdens and benefits of the servitudes did not generally run to subsequent possessors, as well as subsequent owners.").

¶42    Accordingly, to ascertain the duration of the expanded scope of the Dead Corner Road easement, we must examine the record for evidence of the intent or expectations of the parties during the second prescriptive period. *See* Rest. 3d § 4.1(1) & cmt. a, at 496-98. The easement here was created not by express grant from Mr. Walker, but rather by prescriptive use on the part of the Malones and the Briggs. As such, there are no written terms from which we can discern the intent of the parties. For this reason, the relevant focus of our inquiry is on "the expectations the circumstances should reasonably have engendered in the parties," rather than on their intention. *See* Rest. 3d § 4.1 cmt. a, at 498. In this regard, it is appropriate to consider "what a landowner in the position of the owner of the servient estate should reasonably have expected to lose by failing to interrupt the adverse use before the prescriptive period had run." *See* Rest. 3d § 4.1 cmt. h, at 502.

¶43    Applying these principles, it is clear from the circumstances shown in the record that the parties should reasonably have expected the establishment of a permanently expanded scope of the Dead Corner Road easement. First, as of 1980 both the Briggs and the Malones resided on the original dominant tenement (the SW 1/4 of Section 30), and they did so with separate property interests. Significantly, Mr. Walker, who was aware that both families were using the easement, took no legal action with respect to the expanded use. To the contrary, it appears that he acquiesced in the expansion of the easement's scope to benefit the two estates. Accordingly, Mr. Walker should have expected to incur the additional burden of a second homeowner using the Dead Corner Road for ingress and egress purposes to the SW 1/4 of Section 30.

23

¶44    Furthermore, because the Malones held the reversion in the Briggs' life estate, all present and future interest holders participated in the prescriptive use that expanded the scope of the easement between 1980 and 1985. It follows, therefore, that the Malones reasonably expected to receive the benefit of the expansion upon the Briggs' deaths. Indeed, there is not even a hint in the record that the Malones ever intended to abandon or raze the Briggs' homestead or that Mr. Walker expected them to do so. Rather, the record reflects precisely the opposite, as evidenced by the Malones' creation of the Briggs Tract and Mrs. Malone's testimony that she never would have signed the release abandoning the Cut Across Road "had [she] known there was then going to be subsequent dispute over whether [she] could access the Briggs' home site over [the] dead corner."

¶45    Accordingly, we conclude that the scope of the easement established by prescription for the benefit of the SW 1/4 of Section 30 and expanded by a second prescriptive use from 1980 to 1985 for the benefit of two estates--the Malone Property and the Briggs Life Estate--within the SW 1/4 of Section 30 did not revert to the pre-1980 scope upon the termination of the Briggs' life estate. In light of this conclusion, we hold that Leichtfuss' contention that Dabney's ongoing use of the Dead Corner Road for ingress and egress to the Briggs Tract is beyond the scope of the easement, as established during the prescriptive periods, is contrary to the record.

¶46    C.    *The creation of the Briggs Tract did not constitute an increased burden on Leichtfuss' parcels.*

24

¶47 Leichtfuss' other "increased burden" argument focuses on the impact the creation of the Briggs Tract in 1999 had on his parcels. He asserts that

> until the Dabney tract was created, the road which became the easement for Malones by virtue of a prescriptive use . . . served one (1) tract of land. When COS 1553 was filed and the deed recorded transferring the Briggs Tract to Dabney a second tract was created. The road was now being used to service two (2) tracts of land, clearly an increase of the burden on the servient tenement.[11]

Underlying this argument is the premise that the extent of an easement increases due to nothing more than the carving out and selling of a piece of the benefitted property. In other words, Leichtfuss maintains that subdividing a dominant tenement *in and of itself* constitutes an increased burden on the servient tenement, irrespective of whether the use of the easement actually changes.[12] He is mistaken.

¶48 In *Mularoni v. Bing*, 2001 MT 215, 306 Mont. 405, 34 P.3d 497, we observed that if a "dominant tenement is transferred in separate parcels to different persons, each grantee acquires a right to use easements appurtenant to the dominant estate, provided the easements can be enjoyed as to the separate parcels without any additional burden on the servient

---

[11] As noted above (*see* ¶ 35, *supra*), Leichtfuss' contention that the easement "served one (1) tract of land" "until the Dabney tract was created" is based on the theory that the benefit to the Briggs Life Estate was separate from the benefit to the Malone Property and the former terminated upon the Briggs' deaths in 1996.

[12] Leichtfuss argued this position in the District Court in his Response to Defendants' Motion for Summary Judgment: "The Briggs Tract was created in order to have a piece of property to sell to defendant Dabney. This in and of itself expanded the use beyond that which had been established by the Malones' and their predecessor's use of the road. It is apparent that now there are two (2) separate pieces of property, and Dabney's use is an expansion of the Malones' use."

tenement." *Mularoni*, ¶ 27 (internal quotation marks omitted) (quoting 7 Thompson, *supra*, § 60.07(b)(3), at 472). Similarly, in *Burleson*, *supra*, we stated that under Montana easement law, "[a]n easement attaches to property when the dominant tenement is partitioned or subdivided. The easement is apportioned according to the division of the dominant tenement, as long as it does not increase the burden on the servient tenement." *Burleson*, ¶ 18 (citing § 70-17-107, MCA). *See also* 7 Thompson, *supra,* § 60.04(a)(1)(i), at 452 ("Subdivision and conveying away of portions of a dominant estate does not, in and of itself, mean that an additional burden is imposed upon the servient estate.") (internal quotation marks omitted); Bruce & Ely, *supra*, § 8:12, at 8-34 ("Unless restricted by the terms or manner of its creation, the right to use an easement appurtenant extends to each subdivided portion of the dominant estate.").

¶49    Notwithstanding these authorities, Leichtfuss directs our attention to *Leffingwell Ranch, Inc. v. Cieri* (1996), 276 Mont. 421, 916 P.2d 751, in which a landowner had divided its property (the dominant tenement) into 174 individual parcels with the intent of developing and selling the smaller parcels. With respect to the landowner's plan to access these 174 parcels via easements (granted to one of the landowner's predecessors in interest) that historically had been used to access only two or three homesteads, we affirmed the District Court's conclusion that such use would constitute an improper burdening of the easements.

¶50    *Leffingwell Ranch*, however, does not stand for the proposition advanced by Leichtfuss. As we explained in *Kelly*, *supra*, to which Leichtfuss also cites, the landowners in *Leffingwell Ranch* "could not broaden their use to include subdivision access because the

26

use was 'not contemplated by the original parties to the easements [and] would be inconsistent with the historical use of the easements . . . .' " *Kelly*, ¶ 33 (quoting *Leffingwell Ranch*, 276 Mont. at 432-33, 916 P.2d at 758). While the number of parcels to be benefitted by the easements certainly informed our analysis of the extent of the landowner's planned use thereof, nowhere did we state that subdivision of the dominant tenement into multiple parcels constituted, in and of itself, an increased burden on the servient tenements. Rather, we compared the historical use of the easements with the intended and anticipated consequences of the subdivision and concluded that the District Court's finding of an increased burden was correct.

¶51 In another subdivision case, *Guthrie v. Hardy*, 2001 MT 122, 305 Mont. 367, 28 P.3d 467, Hardy acquired the dominant tenement and corresponding easement by deed in 1977. In 1981, he subdivided the parcel into eight 20-acre parcels and eventually sold two parcels each to Miller (in 1986) and Arno (in 1995). However, it was not until 1995, when Hardy and Miller sought to improve a portion of the easement, that a dispute arose with the owners of the servient tenement, who "voiced their concern that the Appellants wished, in fact, to extensively improve the easement road to accommodate further residential development as well as logging in the [dominant tenement]." *Guthrie*, ¶ 12.

¶52 The District Court found that Hardy's use of the easement "changed *beginning in 1995* to the detriment of the servient owners . . . ." *Guthrie*, ¶ 40 (emphasis added). We affirmed this holding, noting that Hardy presently sought to alter the "historic nature" of the easement. *Guthrie*, ¶ 32. Specifically, he planned "to improve the existing road so that it

27

would provide year-around primary access to, at the very least, [his, Miller's, and] Arno's parcels," *Guthrie*, ¶ 35, "and thereby undisputedly alter the nature of his 17 years of use," *Guthrie*, ¶ 33. Furthermore, Hardy had already cleared two new home sites on the dominant tenement, *see Guthrie*, ¶ 36, suggesting that he intended to further develop the parcel which he had subdivided fourteen years earlier. Thus, it was Hardy's actual and planned uses of the easement in 1995, not his subdivision of the dominant tenement in 1981, that exceeded the scope thereof. In other words, we were concerned with the consequences of the subdivision, which in 1981 were nothing but in 1995 were overly burdensome on the servient tenement.

¶53 Our reasoning in both *Leffingwell Ranch* and *Guthrie* is consistent with our approach in *Lindley v. Maggert* (1982), 198 Mont. 197, 645 P.2d 430, which involved an easement in gross. The owners of the servient tenement argued that the holders of the easement should not be allowed to use the easement, which to that point had not been used, "until the District Court determines whether use of the easement . . . will increase the burden on the [servient tenement] beyond that contemplated when the easement was established." *Lindley*, 198 Mont. at 199, 645 P.2d at 431-32. We rejected this argument, explaining that "[t]his Court cannot declare that the proposed use will be inconsistent with the reserved easement on the basis of *speculation* as to possible future uses." *Lindley*, 198 Mont. at 199, 645 P.2d at 432 (emphasis added). Simply put, we will not assume an increased burden; there must be evidence supporting the servient owner's claim.

¶54    Here, the record reflects that the Malones did not subdivide their property with the intent of developing the smaller parcel. Rather, they intended to sell the Briggs Tract as is. Indeed, the ten acres sold to Dabney included the Briggs' *preexisting* house, barn, and other outbuildings; and the anticipated consequences of this sale, with respect to the Dead Corner Road, were that the character and extent of the use of the easement would remain unchanged. With the exception of the improvements made by Dabney to her driveway, this has been the case.

¶55    Moreover, the record is devoid of any evidence that the land constituting the Briggs Tract and the structures thereon have changed to any material extent since they were owned by the Briggs. Leichtfuss asserts that there has been an "increase in traffic" across the dead corner as a result of Dabney's presence; however, he provides no frame of reference for this vague assertion. Does he mean an increase compared with the period between the termination of the Briggs Life Estate in the mid-1990s and the sale of the Briggs Tract to Dabney in 1999? Does he mean an increase compared with the period when the Briggs were using the road to reach their house and barn? The relevant time period for comparison purposes would be the prescriptive periods, which in this case were 1973-1978 for the establishment of the easement and 1980-1985 for the expansion of the easement's scope. We have already concluded that Dabney's using the Dead Corner Road for ingress and egress to the Briggs Tract is not beyond the easement's scope as established during these prescriptive periods. *See* Part 1.B., *supra*. And the District Court found that Dabney uses her property for the same purposes (residential and farming/agricultural) and to the same

29

extent as did the Briggs and the Malones. This finding is supported by substantial evidence in the record. Accordingly, we reject Leichtfuss' argument that the creation and conveyance in fee simple of the Briggs Tract in and of itself constituted an increased burden on his properties.

¶56 D. *Conclusion.*

¶57 In sum, the expanded scope of the Dead Corner Road easement did not revert to a single parcel use upon the termination of the Briggs' life estate in the mid-1990s. Rather, it is clear from the circumstances surrounding the expansion of the easement's scope during the second prescriptive period (1980-1985) that the Malones, the Briggs, and Mr. Walker reasonably expected the establishment of an easement permanently benefitting two separately owned properties within the SW 1/4 of Section 30. Thus, Leichtfuss' characterization of the scope of the Dead Corner Road as a single parcel use is inaccurate.

¶58 Furthermore, the District Court's finding that Dabney's use of her property is the same as her predecessors' use thereof is amply supported by substantial evidence in the record. Hence, this is not a case in which an easement is suddenly being used to serve additional land or additional residences, or in which the character of the easement's use has changed. Unlike *Leffingwell Ranch*, in which 171 to 172 new families would have used the easement in question for ingress and egress to their homes, the same number of families (two) are using the Dead Corner Road presently as used it between 1980 and 1985. Leichtfuss is concerned with the number of separately owned fee simple estates being served by the easement since 1999, as opposed to the actual uses to which the easement historically

30

has been, and is now being, put. This position is based on an incorrect interpretation of our case law, and his suggestion that subdivision of a dominant tenement in and of itself constitutes an increased burden on the servient tenement is rejected.

¶59    *2. Did the District Court err in determining that Dabney could have availed herself of § 70-30-107, MCA (private eminent domain), as a fallback position in the event no prescriptive easement was available for her?*

¶60    In light of our holding under Issue 1 that Dabney has an easement appurtenant benefitting her property, it is unnecessary to reach Issue 2.

¶61    Affirmed.

/S/ JAMES C. NELSON

We Concur:

/S/ KARLA M. GRAY

/S/ BRIAN MORRIS
/S/ W. WILLIAM LEAPHART
/S/ JIM RICE

